# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30161

United States Court of Appeals
Fifth Circuit

**FILED**
August 16, 2018

Lyle W. Cayce
Clerk

DOMINICK PERNICIARO, III,

      Plaintiff - Appellee

v.

HAMPTON "STEVE" LEA, M.D., In his individual and official capacity as administrator and/or employee of Eastern Louisiana Mental Health System ("ELMHS"); JEFFREY S. NICHOLL, M.D., In his individual and official capacity as administrator and/or employee of Eastern Louisiana Mental Health System ("ELMHS"); JOHN W. THOMPSON, M.D., In his individual and official capacity as administrator and/or employee of Eastern Louisiana Mental Health System ("ELMHS"),

      Defendants - Appellants

Appeal from the United States District Court
for the Middle District of Louisiana

Before HIGGINBOTHAM and HIGGINSON, Circuit Judges.[*]

STEPHEN A. HIGGINSON, Circuit Judge:

Dominick Perniciaro, III, who suffers from schizophrenia, has been committed to the Eastern Louisiana Mental Health System ("ELMHS") since

---

[*] Judge Edward C. Prado, a member of our original panel, retired from the court on April 2, 2018, to become His Excellency the United States Ambassador to the Argentine Republic. He therefore did not participate in this matter, which is decided by a quorum. *See* 28 U.S.C. § 46(d).

No. 17-30161

he was arrested for battery and found incompetent to stand trial in 2013. He has sustained numerous injuries throughout his commitment—some minor, some more serious—as a result of physical altercations with other patients and with guards. He filed suit under 42 U.S.C. § 1983, alleging that he received inadequate medical care and that defendants—his treating psychiatrist (Dr. Jeffrey Nicholl), ELMHS's chief of staff (Dr. John Thompson), and its chief executive officer (Hampton "Steve" Lea)—failed to protect him from harm. Only Lea is a state employee. The other defendants are psychiatrists employed by Tulane University who provide services at ELMHS pursuant to a contract between Tulane and the state. All three defendants moved for summary judgment on the basis of qualified immunity. The district court held that the Tulane-employed defendants could raise the defense, but held that none were entitled to summary judgment. We agree that the Tulane-employed defendants may raise qualified immunity, but reverse the denial of summary judgment. Viewing the evidence in the light most favorable to Perniciaro, he has failed to establish that defendants violated his clearly established rights.

**I.**

**A.**

Perniciaro's schizophrenia manifests in symptoms such as auditory hallucinations, paranoia, delusions, and aggression. He suffers from violent outbursts that occur without warning or apparent provocation. Due largely to the unpredictability of his aggressive and assaultive behavior, his doctors have described him as a "challenging" or "very difficult" patient to treat. He has been committed to ELMHS, a mental-health facility owned and operated by the Louisiana Department of Health, since his arrest for battery in 2013. He was found incompetent to stand trial and committed to ELMHS for competency

2

## No. 17-30161

restoration.[1]  When deemed competent to stand trial by his treating psychiatrist in 2014, he was discharged to the Jefferson Parish Prison but was again found incompetent by the state court and recommitted to ELMHS.  One year later, after again being deemed competent to stand trial, he was found not guilty by reason of insanity.  He was recommitted to ELMHS for treatment until no longer dangerous to himself and others.

ELMHS is a state-run facility, but the state has contracted out the provision of psychiatric services to Tulane University.[2]  As with all psychiatrists at ELMHS, Perniciaro's treating psychiatrist, Dr. Jeffrey Nicholl, is an employee of Tulane, where he serves as a professor of clinical psychiatry and neurology.[3]  In addition to his teaching duties, he maintains a caseload of 12 to 13 patients at ELMHS.  As Perniciaro's treating psychiatrist, Dr. Nicholl was the leader of Perniciaro's treatment team and was responsible for developing and updating a holistic treatment plan for Perniciaro's mental and physical health.  Dr. Nicholl was also responsible for making decisions related to Perniciaro's physical safety, such as separating him from other patients following physical altercations or placing him on some form of restrictive observation as needed.

Dr. John Thompson is the chief of staff at ELMHS.  Like Dr. Nicholl, Dr. Thompson is an employee of Tulane University.  He is the chair of the

---

[1] All patients at ELMHS, including Perniciaro, have been committed to the facility by court order.  It is the only facility in the state that treats persons who are found incompetent to stand trial or not guilty by reason of insanity.

[2] Pursuant a contract between Tulane and the state, the university provides ELMHS with a medical director or chief of staff, two clinical directors, and some number of psychiatrists, depending on ELMHS's needs.  The contract covers three-year terms but is updated annually to reflect the institution's needs and budget.

[3] Perniciaro was assigned a new treating psychiatrist, Dr. John Roberts, upon his third admission to ELMHS after being found not guilty by reason of insanity.  Dr. Nicholl, however, served as Perniciaro's treating psychiatrist throughout Perniciaro's first and second admissions, which form the basis of this lawsuit.

No. 17-30161

Department of Psychiatry at Tulane, but works at ELMHS several days per week pursuant to Tulane's contract with the state. As chief of staff, Dr. Thompson oversees the provision of all medical and psychological care. He supervises both the psychiatric doctors, who are not state employees, and the medical doctors and nursing staff, who are. Dr. Thompson reports to Steve Lea, the chief executive officer of ELMHS. Lea, who is employed directly by the state, is responsible for overseeing operations at ELMHS, including ensuring that all state policies are followed.

ELMHS has a policy of minimizing the use of physical restraints as a means of preventing patients from harming themselves and others. Accordingly, ELMHS uses alternative measures to deescalate and monitor patients when they are agitated or likely to become violent. In acute situations, patients are given an injection of medication to immediately calm them down. If the medication fails to calm them down and they remain an immediate danger to themselves or others, then physical restraints may be used. Patients who present a continuous risk of hurting themselves or others are monitored pursuant to either arm's-length observation ("ALO"), meaning that one or two guards must remain within an arm's length of the patient,[4] or close-visual observation ("CVO"), which requires a guard to remain within 15 feet of the patient and maintain the patient within sight at all times.

**1.**

Almost immediately after he was first admitted in 2013, Perniciaro was involved in numerous physical altercations with treatment providers, guards, and other patients. In light of his violent outbursts, Dr. Nicholl placed Perniciaro on ALO within one day of his admission. A few weeks later, while

---

[4] Even while on ALO, however, patients are typically given a little more space while in the bathroom or while sleeping.

the guards assigned to monitor him assisted with another violent patient, Perniciaro ran out of his room and repeatedly struck another patient, referred to as Patient 3800, in the face. Following that incident, Dr. Nicholl spoke to Patient 3800, who denied any feelings of revenge. Perniciaro remained on ALO for approximately three months, at which point he had not had a violent incident in seven weeks. Dr. Nicholl then downgraded Perniciaro from ALO to CVO. He also prescribed various medications for Perniciaro, adjusting them frequently based on Perniciaro's level of violence.

By March 2014, Perniciaro had not been involved in any violent behavior in nearly three months. He was taken off CVO, deemed competent to stand trial by Dr. Nicholl, and discharged to the Jefferson Parish Prison. While at the jail, Perniciaro apparently stopped taking his medication and was involved in one physical altercation, which he said was in self defense. He was again found incompetent to stand trial by the state court and ordered to return to ELMHS.

**2.**

Upon Perniciaro's readmission to ELMHS, he was evaluated by Dr. Nicholl, who found him to be "quite coherent" with "fairly good" judgment. He was also evaluated by two psychologists who found him to be "fairly stable." It appears Perniciaro went for about two weeks without incident after his readmission. However, that ended early one morning in April 2014, when Patient 3800 ran into Perniciaro's room after asking to go to the water fountain and hit him in the face. Perniciaro suffered a black eye, bloody lip, and fractured jaw. He was sent to the hospital for treatment, including surgery to repair his jaw. He returned to ELMHS a few days later, and was placed on a liquid diet and ALO for medical purposes in order to prevent choking. According to Dr. Nicholl, Perniciaro was "very different when he came back

5

from the hospital," possibly because he "may not have gotten his medications" while hospitalized.

Following his return from the hospital, Perniciaro was involved in a number of physical altercations. For example, on one occasion about two months after his return, he struck one guard in the face, punched another in the groin, and attempted to attack a third. That day, the justification for his ALO was changed from "medical" to "assaultive behavior towards others." On another occasion, Perniciaro hit one guard in the jaw and attempted to bite and scratch the eyes of another. He was also involved in physical altercations with other patients. In the vast majority of such altercations, Perniciaro was indicated as the aggressor.

On one occasion, Perniciaro reported that "they" (apparently referring to guards) had attacked him the night before. He had bruising on his arms, knuckles, hips, chest, and legs, which a doctor determined likely resulted from the use of manual holds to break apart physical altercations. Nonetheless, in light of Perniciaro's allegations, a report was made to Adult Protection Services, a division of the Office of Aging and Adult Services ("OAAS"), which is itself part of the Department of Health and Hospitals. During OAAS's investigation, two guards disclosed that Perniciaro's injuries may have been caused by an unreported incident that occurred the day before Perniciaro claimed to have been attacked. The guards disclosed that they had been trying to keep Perniciaro in his room while he tried to push his way out and, in the course of the struggle, Perniciaro's hip and leg were caught between the door and door frame as the guards tried to push the door closed. Following its investigation, OAAS generated a report that was reviewed by an investigative review committee and CEO Lea. After reviewing the report, the committee and Lea found the allegations of abuse to be unsubstantiated.

No. 17-30161

At some point, Perniciaro developed a shoulder injury. The first report of a shoulder injury occurred in July 2014, when Perniciaro lost his balance running out of his room, slipped, and fell, hitting his left shoulder on the ground. He complained of severe shoulder pain and was examined by a medical doctor who did not detect any serious injury or disfigurement but ordered x-rays to confirm. The x-rays did not indicate any injury. During a medical exam about a month later, Perniciaro's left shoulder was found to have a possible old dislocation injury. Subsequent x-rays indicated a displacement and injury to ligaments in the shoulder. A medical exam a few weeks later noted a possible separation of the acromioclavicular ("AC") joint, but found no intervention necessary at that time. At another exam a few weeks after that, Perniciaro did not complain of any pain with shoulder movement. The medical report from that exam notes that "AC Separation Type III can be managed conservatively" and indicates that the treating physician would prescribe pain killers if Perniciaro ever complained of shoulder pain. A few days later, Perniciaro was sent to physical therapy, but the therapist concluded that physical therapy would likely not be helpful at that time. Perniciaro was then referred to an orthopedic specialist for a consultation.[5]

Concerned about his son's injuries, Perniciaro's father, Dominick Perniciaro, Jr., called Lea in the fall of 2014 to discuss Perniciaro's shoulder. Lea then observed Perniciaro's shoulder himself, spoke with one of the ELMHS medical doctors about the treatment Perniciaro was receiving for the injury, and then reported back to Perniciaro, Jr. Perniciaro, Jr. filed an official complaint regarding his son's treatment. The Total Quality Management department at ELMHS responded to the complaint by noting that Lea had

---

[5] Because Perniciaro was discharged in December 2014 when he was deemed competent to stand trial, he did not see the orthopedic specialist until his return to ELMHS in June 2015 after being found not guilty by reason of insanity.

No. 17-30161

already addressed Perniciaro, Jr.'s concerns and that the administration was still investigating.[6]

In early November 2014, Dr. Nicholl started Perniciaro on a new medication. Dr. Nicholl had been wary of prescribing the drug due to its risk of serious side effects. After trying various other drugs, however, he concluded that it was worth the risk because nothing else was able to manage Perniciaro's psychosis and violent tendencies without rendering him overly sedated. Within one week of starting the new drug, Dr. Nicholl described Perniciaro's progress as "nearly unbelievable." Perniciaro was deemed competent to stand trial in December 2014.

**3.**

Perniciaro stood trial and was found not guilty by reason of insanity. He was readmitted to ELMHS in June 2015, and was assigned a new treating psychiatrist.[7] In July, he was seen by an orthopedic specialist, who confirmed an AC separation. The specialist stated in his notes from the exam that "[l]iterature supports treating Grade III AC separation non-operatively," and that "AC repair is controversial" and "not recommend[ed]."

**B.**

Perniciaro initiated this § 1983 action in April 2015, alleging that defendants failed to maintain reasonably safe conditions of confinement and that the medical care he had received at ELMHS fell below the level required under the Fourteenth Amendment. The parties filed cross motions for summary judgment, which the district court denied. As is relevant here, the district court held that although defendants—including the privately employed

---

[6] It appears, however, that the investigation into the incident had already been concluded.

[7] It is unclear whether the change in Perniciaro's treating psychiatrist was due to random assignment or to this litigation.

8

No. 17-30161

Drs. Nicholl and Thompson—were entitled to assert the defense of qualified immunity, issues of material fact precluded summary judgment on that defense. Defendants timely appealed.

## II.

We must first decide whether we have jurisdiction over this interlocutory appeal. "Ordinarily, we do not have jurisdiction to review a denial of a summary judgment motion because such a decision is not final within the meaning of 28 U.S.C. § 1291." *Palmer v. Johnson*, 193 F.3d 346, 350 (5th Cir. 1999). However, the "denial of qualified immunity on a motion for summary judgment is immediately appealable if it is based on a conclusion of law." *Id.* (citing *Johnson v. Jones*, 515 U.S. 304 (1995)). Perniciaro argues that immediate appeal is foreclosed here because the district court's decision was based not on a conclusion of law but on its finding genuine disputes of material fact. *See Johnson*, 515 U.S. at 313 ("[T]he District Court's determination that the summary judgment record in this case raised a genuine issue of fact . . . was not a 'final decision' within the meaning of [28 U.S.C. § 1291].").

But as the Supreme Court clarified in *Behrens v. Pelletier*, 516 U.S. 299 (1996), the "[d]enial of summary judgment often includes a determination that there are controverted issues of material fact, and *Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable." *Id.* at 312–13 (citation omitted). Although we lack jurisdiction to consider "whether there is enough evidence in the record for a jury to conclude that certain facts are true," we do have jurisdiction "to decide whether the district court erred in concluding as a matter of law that officials are not entitled to qualified immunity on a given set of facts." *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc).

Accordingly, we have jurisdiction to review whether—taking Perniciaro's summary judgment evidence as true—defendants' "course of conduct [is]

objectively unreasonable in light of clearly established law." *Id.* at 347. Within that narrow universe, our review is de novo. *Id.* at 349.

### III.

### A.

One more precursory issue requires our attention. Before addressing whether defendants are entitled to qualified immunity, we must decide whether Drs. Thompson and Nicholl are eligible to assert the defense at all. Perniciaro argues that they are not because they are not state employees. Under the facts of this case, however, we hold that Drs. Thompson and Nicholl may raise the defense of qualified immunity even though they are not directly employed by the state.

Private actors may, under some circumstances, be liable under § 1983, *see West v. Atkins*, 487 U.S. 42, 54–57 (1988), but it does not necessarily follow that they may assert qualified immunity, *see Wyatt v. Cole*, 504 U.S. 158, 168–69 (1992). Whether they may depends on two things: (1) principles of tort immunities and defenses applicable at common law around the time of § 1983's enactment in 1871 and (2) the purposes served by granting immunity. *Filarsky v. Delia*, 566 U.S. 377, 383–84 (2012) (holding that a private attorney retained by a county to perform government work may assert qualified immunity); *Richardson v. McKnight*, 521 U.S. 399, 403–04 (1997) (holding that prison guards employed by a private prison-management firm are not entitled to assert qualified immunity).

Circuits are divided on whether privately employed doctors who provide services at prisons or public hospitals pursuant to state contracts are entitled to assert qualified immunity. *Compare McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012) (no immunity for privately paid physician working at county prison), *Jensen v. Lane Cty.*, 222 F.3d 570 (9th Cir. 2000) (no immunity for privately employed psychiatrist providing services at public psychiatric hospital), *and*

No. 17-30161

*Hinson v. Edmond*, 192 F.3d 1342 (11th Cir. 1999) (no immunity for privately employed physician providing services at county jail), *with Estate of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098 (10th Cir. 2016) (immunity for privately employed physician providing services at state penitentiary).[8]    After considering the facts of this case in light of the history and purposes of immunity, we find the cases disallowing immunity distinguishable and hold that Drs. Thompson and Nicholl may assert the defense of qualified immunity.

## 1.

At common law, courts "did not draw a distinction between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities." *Filarsky*, 566 U.S. at 387.   Because § 1983 was not intended to abrogate well-established common-law protections, *id.* at 383–84, it follows that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis," *id.* at 389. Accordingly, the Supreme Court held in *Filarsky* that general principles of immunity at common law supported the right of a private attorney to assert qualified immunity where he had been retained by a municipality on a temporary basis to assist in an internal investigation.  *See id.* at 381, 384–89.

Here, as in *Filarsky*, *see id.* at 381, Drs. Thompson and Nicholl are private individuals who work in a public institution and alongside government employees, but who do so as something other than full-time public employees. And here, as in *Filarsky*, *see id.* at 383, it is clear that their public counterparts would be entitled to assert qualified immunity, *see Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 753 (5th Cir. 2001); *Dolihite v. Maughon ex rel.*

---

[8] Although we have not previously decided the issue in a published opinion, we did decide in *Bishop v. Karney*, 408 F. App'x 846 (5th Cir. 2011), that a privately employed psychiatrist providing services at a state prison could assert qualified immunity.

11

No. 17-30161

*Videon*, 74 F.3d 1027, 1032–33 (11th Cir. 1996).  Accordingly, as in *Filarsky*, general principles of immunity at common law support the right of Drs. Thompson and Nicholl to raise the defense of qualified immunity.[9]

## 2.

The purposes of qualified immunity also weigh in favor of permitting Drs. Thompson and Nicholl to seek its protection.  The Supreme Court has identified three purposes served by qualified immunity:  (1) preventing unwarranted timidity in the exercise of official duties; (2) ensuring that highly skilled and qualified candidates are not deterred from public service by the threat of liability; and (3) protecting public employees—and their work—from

[9] We note that while the Ninth and Eleventh Circuits reached contrary conclusions in *Jensen* and *Hinson*, respectively, they did so before the Supreme Court decided *Filarsky*. Accordingly, they followed *Richardson*'s lead and framed the relevant question as whether there was a firmly-rooted tradition of immunity for private doctors performing some government-related function.  *See Jensen*, 222 F.3d at 576–77; *Hinson*, 192 F.3d at 1345; *see also Richardson*, 521 U.S. at 404 (framing relevant historical inquiry as whether there was "a 'firmly rooted' tradition of immunity applicable to privately employed prison guards"). Finding no tradition of immunity even for doctors working directly for the state, the Ninth and Eleventh Circuits concluded that history did not support immunity for the privately employed doctors there at issue.  *See Jensen*, 222 F.3d at 577; *Hinson*, 192 F.3d at 1345–46.

But *Richardson* considered only the issue of qualified immunity for prison guards employed by and working at a private prison; it explicitly did not consider the more nuanced question of whether a person "briefly associated with a government body, serving as an adjunct to government in an essential governmental activity, or acting under close official supervision" would be entitled to assert immunity.  521 U.S. at 413.  That reserved question was then expressly taken up in *Filarsky*, resulting in a different focus to the necessary historical excavation.  As described above, the Court in *Filarsky* suggests that where the defendant at issue worked in a governmental entity and alongside government employees, the relevant historical question asks whether someone bearing that relationship to the state would have had immunity at common law, not whether immunity was accorded to purely private persons performing some governmental function.  *See* 566 U.S. at 384 (asking whether the common law drew a "distinction" between "public employees" and "private individual[s] 'retained by the City'" (quoting *Delia v. City of Rialto*, 621 F.3d 1069, 1079–80 (9th Cir. 2010))).  The Court's deep dive into the common law yielded an answer in the negative.  *Id.* at 387 ("[T]he common law did not distinguish between public servants and private individuals engaged in public service in according protection to those carrying out government responsibilities.").  The Sixth Circuit decided *McCullum* just months after the Supreme Court decided *Filarsky*.  With respect for our sister circuit's deep historical analysis of whether doctors had any special immunity at common law, *see* 693 F.3d at 702–04, we read *Filarsky* to require a different focus.

No. 17-30161

all of the distraction that litigation entails. *Richardson*, 521 U.S. at 407–12; *Filarsky*, 566 U.S. at 389–90. Those concerns are equally salient, and equally served by the availability of qualified immunity, in the circumstances of this case as in those involving physicians employed directly by the state.

**a.**

First up is preventing unwarranted timidity, "the most important special government immunity-producing concern." *Richardson*, 521 U.S. at 409. In the government context, where institutional rules and regulations "limit the incentive or the ability of individual departments or supervisors flexibly to reward, or to punish, individual employees," immunity is necessary to prevent "overly timid" job performance. *Id.* at 410–11. In contrast, when private entities—like the large prison-management firm at issue in *Richardson*—are "systematically organized to perform a major administrative task for profit," and do so "independently, with relatively less ongoing direct state supervision," then "ordinary marketplace pressures" typically suffice to incentivize vigorous performance and prevent unwarranted timidity. *Id.* at 409–10. *Richardson* explained that private firms generally have more latitude than do public entities to flexibly and creatively use rewards and punishments to encourage employees to strike the right balance between vigor and caution. *See id.* at 410. And, unlike a state entity, any firm that fails to strike that balance risks being replaced by a ready competitor. *See id.* 409.

But the market forces assumed in *Richardson*'s reasoning are much weaker here. First, the state, not Tulane, oversees the operation of ELMHS and the services that Drs. Thompson and Nicholl provide there. ELMHS is a state-run facility, operated pursuant to state policies and overseen by a state employee. Dr. Thompson reports directly to Lea, not to anyone at Tulane. Similarly, issues pertaining to patient safety and the quality of care provided

13

by the Tulane psychiatrists are reviewed by state employees, including Lea.[10] Whereas the Supreme Court in *Richardson* concluded that the private prison guards there at issue "resemble those of other private firms and differ from government employees," 521 U.S. at 410, here we conclude just the opposite. When Drs. Thompson and Nicholl go to work at ELMHS, they act within a government system, not a private one. The market pressures at play within a purely private firm simply do not reach them there.[11]

Furthermore, their direct employer, Tulane University, is not "systematically organized" to perform the "major administrative task" of providing mental-health care at state facilities. *Id.* at 409. Unlike the private entities at issue in cases denying qualified immunity, *see McCullum*, 693 F.3d at 697 ("Community Behavioral Health"); *Jensen*, 222 F.3d at 573 ("Psychiatric Associates"); *Hinson*, 192 F.3d at 1344 ("Wexford Health Sources"), the university's primary function is not providing health-care services, whether by contract or directly. The professors it employs have many duties, including research and teaching, and their pay, as well as other means of incentivization, are likely determined by factors besides the quality of care they provide to any patients they may see at ELMHS. Any marketplace pressures influencing the performance of the university's employees, therefore, are likely not fine-tuned to preventing overly timid care at ELMHS.

---

[10] For example, complaints concerning the provision of psychiatric care are reviewed and addressed by state employees, including Lea, and the Office of Behavior Health, a division of the Louisiana Department of Health. Furthermore, topics pertaining to the quality of psychiatric care and patient safety are discussed by Lea and others, including other state employees, at ELMHS executive board meetings.

[11] This level of state involvement and supervision sets this case apart from the Ninth and Eleventh Circuit cases denying qualified immunity to privately employed doctors. *See Jensen*, 222 F.3d at 573 (denying immunity to psychiatrist employed by one private entity and providing services at county hospital operated by another private entity); *Hinson*, 192 F.3d at 1346–47 (denying immunity to doctor employed by private entity responsible for all policies and procedures regarding provision of medical care at county jail).

No. 17-30161

Finally, it does not appear that the pressures created by the threat of replacement are at play here. Unlike in *Hinson*, where the firm responsible for providing health services in a county jail had recently been replaced in light of performance concerns, 192 F.3d at 1346, Tulane has held the contract to provide psychiatric services for the state since 1992. There is no indication in this record of any other private entities vying for the contract. Under these circumstances, it is unlikely that, absent immunity, market forces would swiftly intervene to discipline overly timid performance.

**b.**

The second purpose identified in *Richardson* is ensuring that the threat of litigation and liability does not deter talented candidates from public service. *Richardson* explained that employees of private firms generally do not need immunity because private firms can offset the risk of litigation and liability with higher pay or better benefits. 521 U.S. at 411. As discussed above, psychiatrists employed by Tulane have many responsibilities, and it is unclear how responsive their pay is to the risks involved in this one subset of their duties. Furthermore, as discussed in *Filarksy*, it is precisely those highly skilled individuals—those who do not depend on any one stream of work for their livelihoods and who have the freedom to select other opportunities that carry less risk of liability—who are particularly likely to decline public service if not given the same immunity as their public counterparts. 566 U.S. at 390. This is particularly so where, as here, the private individuals work in close coordination with government employees who may leave them "holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Id.* at 391.

**c.**

The third and final purpose of qualified immunity identified in *Richardson* is protecting public employees from frequent lawsuits that might

15

distract them from their official duties.  521 U.S. at 411.  As explained in *Filarksy*, the interest in protecting those who perform public duties from distraction applies regardless of whether they are full-time public employees or contractors.  566 U.S. at 391.  And the distraction of a lawsuit against a private individual will "often also affect public employees with whom they work by embroiling those employees in litigation."  *Id.*  So once again, where private individuals work alongside public employees, the interest in extending qualified immunity to those individuals is far greater.

In sum, considering the history and purposes of immunity in conjunction with the facts of this case, we hold that Drs. Thompson and Nicholl may raise the defense of qualified immunity.

**B.**

We now turn to the crux of this appeal.  Having decided that all three defendants are entitled to assert the defense of qualified immunity, we must decide whether they are actually entitled to its protection.  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Once invoked, a plaintiff bears the burden of rebutting qualified immunity by showing two things:  (1) that the officials violated a statutory or constitutional right and (2) that the right was "'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam) ("When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense.").  Law is "clearly established" for these purposes only if "the contours of the right [were] sufficiently clear

that a reasonable official would understand that what he [was] doing violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  An official that violates a constitutional right is still entitled to qualified immunity if his or her actions were objectively reasonable.  *Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1993).  At bottom, a plaintiff must show that "no reasonable officer could have believed his actions were proper."  *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

The parties agree that state officials have a duty under the Fourteenth Amendment to provide involuntarily detained persons with "basic human needs, including medical care and protection from harm."  *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc).  They dispute, however, what body of law clearly establishes the contours of Perniciaro's rights and the corresponding scope of defendants' duties.  Perniciaro contends that because he has been involuntarily committed, rather than incarcerated, the deliberate-indifference standard is inappropriate and defendants' conduct should instead be evaluated in light of the professional-judgment standard established in *Youngberg v. Romeo*, 457 U.S. 307 (1982).  Accordingly, he contends that he has a due-process right to personal safety that is violated if a decision made about his care and safety "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  *Id.* at 323.  Defendants respond that, unlike the plaintiff in *Youngberg*, Perniciaro was not involuntarily civilly committed but was, at all times relevant to this appeal, a pre-trial detainee.  They argue that the deliberate-indifference standard, which we have held applies to pre-trial detainees, *see Hare*, 74 F.3d at 647–48, is therefore appropriate.  Because we conclude that defendants are

No. 17-30161

entitled to qualified immunity under either standard, we need not decide which applies.[12]

**1.**

Even if we agreed that the professional-judgment standard applies to persons detained pre-trial for competency restoration, Perniciaro still would have failed to establish that defendants' conduct violated clearly established law.[13] *See Bennett v. City of Grand Prairie*, 883 F.2d 400, 408 (5th Cir. 1989) ("The party seeking damages from an official asserting qualified immunity bears the burden of overcoming the defense."). Perniciaro has not cited a single case—either in his briefing before the district court or before us—clearly establishing that the particular conduct at issue here violates the professional-judgment standard. Thus, he has failed to address the dispositive question: "[W]hether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742).

Perniciaro relies on the general statement that, under *Youngberg*, his due-process rights to care and safety were violated because defendants' actions "[were] such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." But general propositions of law

---

[12] The district court similarly declined to decide which standard applies. The district court concluded that summary judgment was inappropriate under either standard, but analyzed the facts of the case only under the "more stringent 'deliberate [in]difference' standard.'"

[13] We harbor doubt, however, that it has been clearly established that *Youngberg* applies to persons detained pre-trial for competency restoration. *Youngberg* considered persons who were involuntarily civilly committed, and reasoned that deliberate indifference was an inappropriate metric by which to assess alleged violations of their constitutional rights to safety and care because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 321–22. However, we have held that deliberate indifference is the appropriate standard to apply to inadequate-medical-care or failure-to-protect claims brought by pre-trial detainees who, like persons involuntarily committed, may not constitutionally be punished. *Hare*, 7 F.3d at 639, 643.

defined at "high level[s] of generality" are insufficient to define clearly established law for purposes of defeating qualified immunity. *al-Kidd*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality."); *see also Mullenix*, 136 S. Ct. at 308–09 (holding general rule that police "may not 'use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others'" was insufficient to define clearly established law in qualified-immunity inquiry (quoting *Luna v. Mullenix*, 773 F.3d 712, 725 (5th Cir. 2014))).

Even assuming that the *Youngberg* standard applies, Perniciaro has failed to establish that defendants' conduct was objectively unreasonable in light of clearly established law.[14]

**2.**

Perniciaro also argues, in the alternative, that defendants are not entitled to qualified immunity under the clearly established deliberate-indifference standard.  But assuming—as did the district court—that the deliberate-indifference standard applies, defendants would still be entitled to qualified immunity.  The evidence, taken in the light most favorable to

---

[14] Of course, *Youngberg* is, if anything, a less deferential, higher standard for state officials than is deliberate indifference. *See Youngberg*, 457 U.S. at 321–22 (adopting professional-judgment standard, instead of applying deliberate indifference, because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals"); *Shaw ex rel. Strain v. Strackhouse*, 920 F.2d 1135, 1145 (9th Cir. 1990) (contrasting deliberate-indifference and professional-judgment standards and indicating that the latter is easier for plaintiffs to meet). *But see Yvonne L. ex rel. Lewis v. New Mex. Dep't of Human Servs.*, 959 F.2d 883, 894 (10th Cir. 1992) (doubting whether there is a difference between the two standards). Accordingly, assuming that the professional-judgment standard applied, Perniciaro would be able to defeat qualified immunity despite the failure to cite cases establishing that the particular conduct here at issue violated that standard if he were able to establish that defendants' conduct violated clearly established law applying the deliberate indifference standard. However, as discussed below, he has failed to do that.

No. 17-30161

Perniciaro, fails to establish a dispute of material fact as to whether defendants' conduct was objectively unreasonable in light of clearly established law.

**a.**

We first address Dr. Nicholl, Perniciaro's treating psychiatrist and the leader of his treatment team. In denying Dr. Nicholl's motion for summary judgment, the district court cited evidence of Dr. Nicholl's failure to: protect Perniciaro from numerous injuries; place Perniciaro on ALO immediately upon his second admission; protect him from Patient 3800; treat his shoulder injury; and implement reasonable alternative psychiatric treatments. We conclude that Dr. Nicholl's conduct was objectively reasonable in light of clearly established law. He is therefore entitled to qualified immunity.

The first three grounds for denying summary judgment cited by the district court pertain to Perniciaro's claim that defendants failed to protect him from harm. Under the deliberate-indifference standard, an official may be held liable for his or her failure to protect only when he or she is deliberately indifferent to a substantial risk of serious harm. *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003). An official is deliberately indifferent if he or she both knows of an excessive risk of harm and disregards that risk. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Knowledge, in this context, requires that an official is both aware of facts from which an inference of harm could be drawn and actually draws that inference. *Id.* (citing *Farmer*, 511 U.S. at 839–40). An official with subjective knowledge of a risk may still be free from liability if he or she "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Here, Perniciaro failed to present evidence that Dr. Nicholl was deliberately indifferent to a substantial risk of serious harm. With respect to the number of injuries, the record establishes that Perniciaro was the

aggressor in the vast majority of violent incidences in which he was involved, and that Dr. Nicholl responded reasonably by placing Perniciaro on ALO following incidences of violence, keeping him on ALO until such time as he had been free of violent outbursts for several weeks,[15] adjusting his medications to help control his violent tendencies, and, in acute situations, placing Perniciaro in clinical seclusion or authorizing additional doses of medication to immediately calm him.

Although Dr. Nicholl did not place Perniciaro on ALO immediately upon his second admission, that, too, was objectively reasonable in light of clearly established law. Liability attaches only when an official has actual knowledge of a substantial risk of serious harm. *Farmer*, 511 U.S. at 837. Upon Perniciaro's second admission, Dr. Nicholl reasonably believed that Perniciaro did not face a substantial risk of harm from his violent outbursts; evaluations at the time of his readmission found Perniciaro to be "fairly stable," "quite coherent," and with "fairly good" judgment. Notably, Dr. Nicholl's report indicated that Perniciaro "did not seem to have demonstrated any violent behavior" while incarcerated before his readmission, with the exception of one incident that Perniciaro claimed was in self defense. It was also reasonable for Dr. Nicholl to believe that Patient 3800 did not pose any threat to Perniciaro. After Perniciaro attacked Patient 3800, Patient 3800 denied any feelings of revenge when Dr. Nicholl spoke with him. Significantly, there is no evidence of any other physical altercation between Perniciaro and Patient 3800 between the initial incident in September 2013 and Perniciaro's discharge to the Jefferson Parish Prison in March 2014. Even if Dr. Nicholl should have

---

[15] We note that there are not claims in this case against the guards responsible for carrying out the ALO.

No. 17-30161

inferred some risk of harm, that alone would not establish deliberate indifference. *See Adames*, 331 F.3d at 514.

The remaining grounds on which the district court denied Dr. Nicholl's motion for summary judgment pertain to Perniciaro's inadequate-medical-care claim. Here again, deliberate indifference requires that an official know of and disregard an excessive risk to health or safety. *See Domino*, 239 F.3d at 755 (citing *Farmer*, 511 U.S. at 837). Disagreements regarding the proper course of treatment or the failure to provide optimal care are insufficient. *See Gobert v. Caldwell*, 463 F.3d 339, 349 (5th Cir. 2006); *Domino*, 239 F.3d at 756; *Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001). Rather, a plaintiff must show that officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

With respect to his shoulder injury, Perniciaro has failed to muster evidence that Dr. Nicholl was deliberately indifferent to a substantial risk of serious harm. Perniciaro does not dispute that he was treated for this injury.[16] Rather, he contends that Dr. Nicholl was deliberately indifferent to his serious medical needs by failing to create a holistic treatment plan that adequately considered both his mental and medical health. Perniciaro points to Dr. Nicholl's deposition testimony that his involvement in the "treatment of nonpsychiatric medical conditions" was "basically, none." But that does not

---

[16] Indeed, his shoulder was examined by medical doctors at least five times between July 2014 (when it appears Perniciaro first reported shoulder pain) and October 2014. X-rays were taken at least twice, and Perniciaro was prescribed pain killers and was sent for physical therapy. Notes in his medical records indicate that the type of shoulder injury he suffered—an "AC Separation Type III"—"can be managed conservatively" and that surgery is generally not recommended. To the extent Perniciaro contends he should have received more aggressive treatment, such disputes about the proper course of treatment are insufficient to establish deliberate indifference. *See Gobert*, 463 F.3d at 349.

establish deliberate indifference.   Dr. Nicholl further testified that if he thought one of his patients had a medical problem, he would "refer them to the medical doctor."   Delegation to a doctor trained to address a patient's medical needs does not evince the kind of wanton disregard necessary to establish deliberate indifference.  *See Gobert*, 463 F.3d at 350 n.35 ("Continuous personal treatment by the defendant physician is not constitutionally mandated.").  The undisputed evidence shows that Dr. Nicholl regularly reviewed Perniciaro's medical records and incident reports and that he referred his patients to medical doctors in the event of a medical concern.  Doing so was objectively reasonable.

The district court also concluded that summary judgment could not be granted in light of a factual dispute regarding whether "there are reasonable treatments available that would assist this Plaintiff but are not being offered or considered by Defendants."  It appears that the district court was referring to the testimony of Perniciaro's expert, who identified a different antipsychotic drug and electro-shock therapy as other, untried treatment options.  But the existence of alternative treatment options does not itself render the treatment received unconstitutional.   *See Estelle*, 429 U.S. at 107 ("[T]he question whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997) (observing that "[d]isagreement with medical treatment does not state a claim" for deliberate indifference).   And even Perniciaro's expert testified that the medications Dr. Nicholl did prescribe were "very good medicines at very good doses."

In sum, Perniciaro has failed to show that Dr. Nicholl's conduct was objectively unreasonable in light of clearly established law, and Dr. Nicholl is therefore entitled to qualified immunity.

**b.**

The district court also denied summary judgment for Dr. Thompson and Lea. Perniciaro argues that both were deliberately indifferent by failing to train and supervise their subordinates, including Dr. Nicholl. Of course, there is no vicarious or *respondeat superior* liability under § 1983. *See Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005). Supervisory liability attaches only when: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Id.*

Perniciaro contends that Dr. Thompson—the chief of staff at ELMHS responsible for overseeing the provision of care—was deliberately indifferent by failing to adequately supervise Dr. Nicholl in light of Perniciaro's myriad injuries and Dr. Nicholl's failure to create a holistic treatment plan. But without an underlying constitutional violation—of which we have found none—there can be no supervisory liability. *See Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006) ("It is facially evident that this test [for supervisory liability] cannot be met if there is no underlying constitutional violation."). Perniciaro has failed to establish that Dr. Thompson violated his clearly established rights, and Dr. Thompson is therefore entitled to qualified immunity.

As to Lea, the CEO of ELMHS, Perniciaro contends that he was deliberately indifferent by failing to adequately supervise Dr. Nicholl, failing to adequately supervise and train the guards on the proper implementation of ALO, and failing to ensure that all incidences of injuries or violence were reported. Regarding Lea's supervision of Dr. Nicholl, once again the absence of an underlying constitutional violation precludes supervisory liability.

No. 17-30161

Regarding the supervision and training of guards and reporting of injuries, Perniciaro's claims fare no better. Perniciaro has failed to identify any deficiency in the guards' training, *see Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) ("[F]or liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective."), and there is neither evidence that Lea knew that guards were not properly implementing ALO nor evidence that the need for additional supervision or training should have been obvious. In an environment like ELHMS, where guards are tasked with the difficult job of keeping mentally ill and potentially violent individuals safe from themselves and from one another, the fact that Perniciaro was injured while on ALO is not itself sufficient to make the need for further supervision or training obvious. *See Roberts*, 397 F.3d at 294 (concluding that past instances of police officer's displaying weapon during traffic stop did not place police chief on notice regarding risk that the officer would use excessive force in part because "traffic stops . . . are inherently dangerous").

Finally, although Perniciaro points to evidence that he twice sustained injuries that were either unreported or untimely reported, he presented no evidence, nor even argument, that those failures were causally connected to any constitutional violation. Nor is there evidence that those two failures made the inadequacy of existing training and supervision "obvious and obviously likely to result in a constitutional violation." *Brown*, 623 F.3d at 255 (quoting *Estate of Davis*, 406 F.3d at 381). Accordingly, Lea, too, is entitled to qualified immunity.

## IV.

For the foregoing reasons, we REVERSE the denial of summary judgment and RENDER judgment in favor of Lea, Dr. Thompson, and Dr. Nicholl.

25