# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-20519

United States Court of Appeals
Fifth Circuit

**FILED**
May 2, 2019

Lyle W. Cayce
Clerk

JERRY REED,

       Plaintiff–Appellant,

v.

ALLISON TAYLOR, in her Individual Capacity; BARBARA MACNAIR, in her Official and Individual Capacity; PROGRAM SPECIALIST HOLLY WHITE, in her Official and Individual Capacity; KRISTY ALFORD, in her Official and Individual Capacity; MARSHA MCLANE, in her Official Capacity,

       Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before ELROD, WILLETT, and DUNCAN, Circuit Judges.

DON R. WILLETT, Circuit Judge:

Jerry Reed is a civilly committed sexually violent predator. Under now-repealed Texas law, he had to pay for GPS monitoring or else face criminal prosecution. Reed's sole income, though, was Social Security. He contends that the pay-or-be-prosecuted penalty violated the Social Security Act's anti-attachment provision, 42 U.S.C. § 407(a), which protects benefits from "execution, levy, attachment, garnishment, or other legal process."

Reed is mistaken. His Social Security benefits were not executed on, levied, attached, or garnished. And "other legal process" is not a limitless

No. 17-20519

catchall. The time-honored *ejusdem generis* canon confines the phrase to processes like those specifically enumerated. Section 407(a) has a familiar specific-then-general syntactic construction where the upfront enumeration limits the tagalong residual phrase. In other words, "other legal process" doesn't mean *any* process; it means other *similar* process. And because the threat of criminal prosecution differs materially from the specific processes listed, we AFFIRM the district court's judgment.

I

The Texas Office of Violent Sex Offender Management was responsible for Reed's treatment and supervision.[1] Texas Health and Safety Code Chapter 841 and Reed's Order of Commitment require him to wear a GPS tracking device.[2] Chapter 841 also requires him to pay for the tracking service.[3] During the applicable period, failure to pay was punishable as a third-degree felony.[4] (The criminal penalty was repealed in 2015.[5]) The defendant officials each implemented or enforced that statutory requirement.[6] Put differently, each official told Reed he had to pay for GPS tracking or be liable for a felony.

---

[1] This entity has since been renamed the Texas Civil Commitment Office.

[2] TEX. HEALTH & SAFETY CODE § 841.082(a)(4).

[3] *Id.* § 841.084(a)(1)(B). The district court helpfully summarized how the various Chapter 841 provisions operated:

> While the penal statue § 841.085 never referenced a violation of § 841.084, which is the statute imposing on the SVP [sexually violent predator] an obligation to pay for the tracking service, it did . . . criminalize a failure to participate in and comply with the sex offender program provided by OVSOM [Office of Violent Sex Offender Management] and to comply with all written requirements imposed by OVSOM.

[4] Act of June 18, 1999, 76th Leg., R.S., § 4.01 (codified as amended at TEX. HEALTH & SAFETY CODE § 841.085).

[5] *See* Act of June 17, 2015, 84th Leg., R.S., § 19 (codified at TEX. HEALTH & SAFETY CODE § 841.085) (repealing criminal penalty for noncompliance with § 841.082(a)(3)).

[6] For purposes of this appeal the defendant officials are Allison Taylor, Barbara MacNair, Holly White, and Kristy Alford.

## No. 17-20519

Reed is "totally blind" and receives Social Security disability benefits. For at least part of the applicable time, Social Security was his only source of income. Reed asserts that requiring him to pay for GPS monitoring under threat of criminal prosecution subjected his Social Security money to "other legal process" in violation of § 407(a). He sued the officials for damages under 42 U.S.C. § 1983.

The district court granted summary judgment to the officials based on qualified immunity, holding that the threat of criminal prosecution wasn't "other legal process" under clearly established law. Reed appealed. We appointed counsel to assist Reed under the circuit's pro bono program and deeply appreciate counsel's able representation.

## II

The rules governing our consideration are familiar.

*First*, the standard of review. We review immunity-based grants of summary judgment de novo.[7]

*Second*, the summary-judgment standard. Under Rule 56, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8]

*Third*, the qualified-immunity standard. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[9] "Once invoked, a plaintiff bears the burden of rebutting qualified immunity by showing two things: (1) that the

---

[7] *Stidham v. Tex. Comm'n on Private Sec.*, 418 F.3d 486, 490 (5th Cir. 2005) ("We review *de novo* the district court's grant of summary judgment based on qualified immunity.").

[8] FED. R. CIV. P. 56(a).

[9] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

No. 17-20519

officials violated a statutory or constitutional right and (2) that the right was 'clearly established at the time of the challenged conduct.'"[10] Clearly established means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[11] "The central concern is whether the official has fair warning . . . ."[12] "To answer that question in the affirmative, we must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity."[13]

## III

The question is straightforward: Did the GPS payment policy subject Reed's Social Security benefits to "execution, levy, attachment, garnishment, or other legal process" in violation of § 407(a)? The answer, equally straightforward, is no.

## A

Our Constitution's ingenious architecture demands that judges be sticklers when decoding legislative text. The law begins with language, and the foremost task of legal interpretation is divining what the law *is*, not what the judge-interpreter *wishes* it to be.

On that score, our precedent favors bright lines and sharp corners, including unswerving fidelity to statutory language: "Text is the alpha and the omega of the interpretive process."[14] Judges are minders, not makers or

---

[10] *Perniciaro v. Lea*, 901 F.3d 241, 255 (5th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

[11] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[12] *Delaughter v. Woodall*, 909 F.3d 130, 140 (5th Cir. 2018).

[13] *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quoting *al-Kidd*, 563 U.S. at 742).

[14] *United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018); *see also, e.g., United States v. Lauderdale County*, 914 F.3d 960, 964 (5th Cir. 2019) ("The task of statutory

menders. All to say, we must take Congress at its word, presume it meant what it said, and refuse to revise statutes under the guise of interpreting them.[15]

True, congressional handiwork is now and again imprecise—sometimes inadvertently, sometimes intentionally. But judges rarely need secret decoder rings to decrypt legislative language. Statutory language, like all language, is suffused with age-old interpretive conventions. And judges, like all readers, must be attentive not to words standing alone but to surrounding structure and other contextual cues that illuminate meaning.[16]

This case is about the legal interpretation of three words—"other legal process"—but that task requires us to discern the meaning of accompanying words and how they are knit together.[17] Robotic literal parsing can sometimes cloak rather than clarify.[18] In this case, familiar linguistic clues—not to mention on-point Supreme Court precedent—reveal § 407(a)'s semantic import as a harmonious whole.

B

Our inquiry begins and ends with the text of § 407(a), which limits the taking of Social Security benefits:

---

interpretation begins and, if possible, ends with the language of the statute." (quoting *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013))).

[15] *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[I]n interpreting a statute a court should always turn to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (citations omitted)).

[16] *See United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018) ("[T]ext may not be divorced from context." (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 356 (2013))).

[17] *See Doe v. KPMG, LLP*, 398 F.3d 686, 688 (5th Cir. 2005) ("When interpreting a statute, we start with the plain text, and read all parts of the statute together to produce a harmonious whole.").

[18] *See Ramos-Portillo v. Barr*, 919 F.3d 955, 960 (5th Cir. 2019) ("In interpreting a statute, we do not look at a word or a phrase in isolation. The meaning of a statutory provision 'is often clarified by the remainder of the statutory scheme . . . .'" (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014))).

> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to **execution, levy, attachment, garnishment, or other legal process**, or to the operation of any bankruptcy or insolvency law.

The phrasing of the bolded language requires application of the *ejusdem generis* canon: "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."[19] Section 407(a) follows this familiar semantic structure, meaning the follow-on phrase "other legal process" is limited to processes like "execution, levy, attachment, [or] garnishment." Common phrasing; common-sense meaning. A broader reading would "fail[] to give independent effect to the statute's enumeration of the specific categories" earlier in the sentence.[20]

The Supreme Court agrees. In *Keffeler*, the Court held that the "usual rules of statutory construction" require a "restrictive understanding of 'other legal process.'"[21] The issue was whether the state of Washington could use children's Social Security benefits to reimburse itself for their foster care.[22] The plaintiffs contended that this unlawfully subjected the children's benefits to "other legal process."[23] The Court invoked both *ejusdem generis* and *noscitur a*

---

[19] *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (alteration in original) (quoting 2A N. SINGER, SUTHERLAND ON STATUTES AND STATUTORY CONSTRUCTION § 47.17 (1991)).

[20] *Id.* at 114; *see CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011) ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless."); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199–200 (2012).

[21] *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385–86 (2003).

[22] *Id.* at 375.

[23] *Id.* at 383.

*sociis*.[24] It held that "other legal process" in context means "process much like the processes of execution, levy, attachment, and garnishment" and so requires (1) "utilization of some judicial or quasi-judicial mechanism," (2) "by which control over property passes from one person to another," (3) "to discharge or secure discharge of an allegedly existing or anticipated liability."[25] So Washington's use of Social Security money to offset foster care expenses was not "other legal process." It did not use judicial or quasi-judicial means; did not pass control of any funds (which were already in the state's possession because it had "representative payee" status under the Act); and did not discharge an enforceable obligation.[26]

Applying *Keffeler* to this case, the specter of prosecution is not "other legal process." Although the threat led to a transfer of property, and arguably discharged a Chapter 841 liability, it did not use a judicial or quasi-judicial mechanism. A threat of future action is not an "exercise of some sort of judicial or quasi-judicial authority to gain control over another's property" as *Keffeler* puts it.[27] Congress protected Social Security beneficiaries from judicially enforced transfers, not threats of liability.[28]

Reed's contrary cases are distinguishable or otherwise unpersuasive in light of *Keffeler*. First are two other Supreme Court cases interpreting § 407(a). In *Philpott v. Essex County Welfare Board*, the Court prohibited New Jersey from attaching a man's Social Security money to secure his repayment of state welfare benefits.[29] The Court held that this action "was an attempt to subject

---

[24] *Id.* at 384.

[25] *Id.* at 385.

[26] *Id.* at 386.

[27] *Id.*

[28] *See Wojchowski v. Daines*, 498 F.3d 99, 106–10 (2d Cir. 2007) (overruling, based on *Keffeler*, Second Circuit precedent that threats are "other legal process").

[29] 409 U.S. 413, 415 (1973).

the money to 'levy, attachment . . . or other legal process'" and thus violated § 407(a).[30] Similarly, in *Bennett v. Arkansas* the Court held that Arkansas could not "attach certain federal [Social Security] benefits paid to individuals who are incarcerated in Arkansas prisons."[31]

Both *Philpott* and *Bennett* are distinguishable. They do not interpret "other legal process." Rather, as the Court explained in *Keffeler*, "both *Philpott* and *Bennett* involved judicial actions in which a State sought to attach a beneficiary's Social Security benefits . . . . Unlike the present case, then, both *Philpott* and *Bennett* involved forms of legal process expressly prohibited by § 407(a)."[32]

Reed also cites dicta from our unpublished decision *In re Mayer*.[33] *Mayer* held that a court's sanction, payable by necessity from the party's Social Security benefits, was not "other legal process" under § 407(a).[34] It distinguished the sanction from the "threat of a lawsuit," suggesting that § 407(a) might forbid such a thing.[35] But the Supreme Court's later decision in *Keffeler* undermined this dictum when it held that "other legal process" must be similar to the enumerated judicial actions.[36]

Reed next cites the Eight Circuit's pre-*Keffeler* decision *King v. Schafer*.[37] The issue was whether Missouri could access committed mental-health patients' Social Security benefits to pay for their care.[38] The court faced two types of alleged "other legal process." First, where the patients' family

---

[30] *Id.* at 416 (ellipsis in original) (quoting 42 U.S.C. § 407(a)).

[31] 485 U.S. 395, 396 (1988) (per curiam).

[32] 537 U.S. at 388.

[33] 193 F.3d 516, 1999 WL 706062, at *4 (5th Cir. 1999) (unpublished).

[34] *Id.*

[35] *Id.*

[36] *See* 537 U.S. at 385.

[37] 940 F.2d 1182 (8th Cir. 1991).

[38] *Id.* at 1183.

members were receiving the benefits as representative payees, the court held that § 407(a) prohibited the state from threatening to sue them or seize their state income tax refunds unless they remitted the money for their relatives' care.[39] Such a threat was prohibited "other legal process."[40] This holding supports Reed's theory that a threat of legal action can violate § 407(a). Second, where the state was receiving the benefits as representative payee, its use of the money to offset costs of the beneficiaries' care was not "other legal process."[41] The state's representative-payee status was material because a procedure explicitly endorsed in one part of the Act could not be prohibited under a different part.[42]

*King* is persuasive only to the extent it doesn't conflict with *Keffeler*. Promisingly for Reed, the Supreme Court in *Keffeler* cited *King* favorably.[43] But the Court cited only the holding that the state could use the funds when it was a representative payee; it did not address the portion of *King* that's relevant here—the state's ability to threaten judicial action when it is not a representative payee.[44] That holding had no application in *Keffeler*, because *Keffeler* was not about threats and was limited to the state-as-representative-payee context.[45] Despite following *King*'s representative-payee holding, *Keffler* implicitly disapproved *King*'s threats holding. The Court's textual analysis of

---

[39] *Id.* at 1185.

[40] *Id.* ("What the state cannot do, it cannot threaten to do.").

[41] *Id.*

[42] *Id.*

[43] 537 U.S. at 384 n.7.

[44] *See id.*

[45] *See id.* at 382–83 ("The questions to be answered in resolving this case . . . are whether the department's effort to become a representative payee, or its use of respondents' Social Security benefits when it acts in that capacity, amounts to employing an 'execution, levy, attachment, garnishment, or other legal process' within the meaning of § 407(a).").

No. 17-20519

§ 407(a) is inconsistent with *King*'s holding that threats are other legal process.[46] *King* cannot save Reed's argument in this case.[47]

Finally, Reed argues that criminal prosecution of debtors has historically been used as legal process to collect obligations and secure the transfer of property, so it is similar to execution, levy, attachment, or garnishment. But Reed supports this proposition only by citation to a journal article, not controlling or persuasive law, and he acknowledges that criminal prosecution of debtors is "archaic." The officials in this case did not violate § 407(a) by threatening to enforce Chapter 841's criminal penalties.[48]

---

[46] *See Keffeler*, 537 U.S. at 385; *Wojchowski*, 498 F.3d at 106–10 (overruling, based on *Keffeler*, Second Circuit precedent that threats are "other legal process").

[47] Reed cites one post-*Keffeler* case holding that a threat is "other legal process." *Albright v. Allied Int'l Credit Corp.*, No. CV034828CAS(RZX), 2003 WL 22350928, at *3 (C.D. Cal. Aug. 25, 2003). *Albright* attempts to distinguish *Keffeler* because it did not expressly address threats of future action. *Id.* This is unconvincing. An executive (or private) threat of future action is not the same as the concrete "writ[s]," "order[s]," or "summons" analogized in *Keffeler*, which generally would have been approved by a court. 537 U.S. at 385 (quoting Social Security Administration Program Operations Manual System).

[48] A decade ago in *Pearson v. Callahan*, the Supreme Court altered the mechanics of qualified-immunity analysis. 555 U.S. 223, 231 (2009). In short, *Pearson* relaxed the categorical *Saucier* two-step inquiry that had required courts to first decide whether the law was violated before turning to whether the law was clearly established. *See Saucier v. Katz*, 533 U.S. 194 (2001). Post-*Pearson*, courts have case-by-case discretion to leapfrog Prong One if Prong Two is outcome-determinative. 555 U.S. at 236. In this case, as in most, we believe it is worthwhile to follow the *Saucier* sequence and not bypass the first inquiry. First, *ejusdem generis* renders the textual analysis easy. In many cases the Prong One issue is doubly challenging: legally difficult and inadequately briefed. Neither is true here. Second, as a practical matter, identifying whether this law was clearly established requires almost all the work of deciding whether a violation occurred. Examining one necessarily overlaps with the other. It is "difficult to decide whether [the] right is clearly established without deciding precisely what the existing . . . right happens to be." *Id.* (quoting *Lyons v. Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)). Third, confronting Prong One enables us to reinforce bedrock principles of statutory interpretation that have application beyond this case. *See Zadeh v. Robinson*, 902 F.3d 483, 493 (5th Cir. 2018). Fourth, as the Supreme Court has itself modeled, it advances the development of the law to clarify for future cases what conduct is prescribed and proscribed. *See Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (noting that the *Saucier* procedure remains "worthwhile," and even if Prong Two is itself determinative, addressing Prong One "is often beneficial" because it "promotes the development of constitutional precedent" (quoting *Pearson*, 555 U.S. at 236)); *see also, e.g.*, *Zadeh*, 902 F.3d at 498–99 (Willett, J., concurring dubitante) (flagging the concern of

10

No. 17-20519

C

Alternatively, the officials' challenged conduct did not violate a *clearly established* right.[49] Even if *Keffeler*'s interpretation of "other legal process" could encompass the threat of criminal prosecution, Reed has not identified "controlling authority" or a "robust consensus of persuasive authority" that defined the right favorably to him "with a high degree of particularity."[50] The officials are thus entitled to qualified immunity under either prong.[51]

IV

Criminalizing a sexually violent predator's failure to pay for GPS monitoring is not "other legal process" under § 407(a). The district court correctly interpreted the anti-attachment provision; the Texas officials are entitled to qualified immunity; and we AFFIRM.

---

"constitutional stagnation"—"fewer courts establishing law at all, much less *clearly* doing so"). Section 407(a) remains on the books, even if Texas's noncompliance penalty does not.

[49] *See Plumhoff*, 572 U.S. at 781 (holding that defendants did not violate the asserted right and, in the alternative, did not violate clearly established law).

[50] *Morgan*, 659 F.3d at 371–72 (quoting *al-Kidd*, 563 U.S. at 742).

[51] Today's decision only reaches whether the officials' actions violated § 407(a) and whether this was clearly established. We otherwise express no opinion about Texas's now-repealed policy.

No. 17-20519

JENNIFER WALKER ELROD, Circuit Judge, concurring in the judgment:

I agree with the panel majority's ultimate conclusion. We should affirm the district court's grant of summary judgment. But we should reach that conclusion by addressing only the second prong of qualified immunity—not the first.

In 2015, as the panel majority observes, Texas repealed the criminal penalty for failure to pay for GPS monitoring. Resolving whether that state law violates the Social Security Act is therefore unnecessary because the law no longer exists. The main justifications for addressing the first prong of qualified immunity are to prevent stagnation in the law's development and to keep "government officials [from] violat[ing] . . . rights with impunity." Aaron Nielson & Christopher J. Walker, *The New Qualified Immunity*, 89 S. Cal. L. Rev. 1, 12 (2015) (quoting Jack M. Beermann, *Qualified Immunity and Constitutional Avoidance*, 2009 Sup. Ct. Rev. 139, 149). Neither concern is implicated here. We need not illuminate whether threatening a social security beneficiary with prosecution is legal under federal law; it is not even legal under state law anymore. And we need not prevent officials from potentially violating the rights of social security beneficiaries in this way because state law no longer allows those officials to do so.[1] All that remains is whether Reed is entitled to damages. It is enough to answer that question by looking

---

[1] The State of Texas—knowing that Congress had protected social security benefits from "execution, levy, attachment, garnishment, or other legal process," 42 U.S.C. § 407(a)—sought out other avenues to procure payment for GPS monitoring from a blind person whose sole income was social security benefits. The State threatened Reed with criminal prosecution—for a third-degree felony—if he failed to fork over some of his social security benefits. Succumbing to this threat, Reed called a cab each month to travel to his local grocery store and purchase a money order. Every month, he received somewhere between $628 and $731 in social security benefits and mailed a money order between $95 and $167 to keep the would-be felony prosecutors at bay.

12

No. 17-20519

exclusively to whether the law in this area was clearly established at the time that Reed made his coerced payments.  I agree with the panel majority that it was not.  For that reason, I concur in the judgment.