IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 26, 2021 Session

**STATE OF TENNESSEE v. RAYMOND BRANDON SAFFLES**

**Appeal from the Criminal Court for Monroe County**
**No. 19-370     Sandra N. C. Donaghy, Judge**
_____

**No. E2020-01116-CCA-R3-CD**
_____

The Defendant, Raymond Brandon Saffles, was charged by criminal information with one count of arson, and he entered a guilty plea to this charge the same day.  See Tenn. Code Ann. § 39-14-301.  The trial court, after accepting his plea agreement, sentenced the Defendant to six years, suspended this sentence, and then ordered the Defendant to serve 364 days in jail before serving six years on supervised probation.  The trial court also ordered that the Defendant have no contact with the victim or her property and that restitution would be determined at a later hearing.  Following this hearing, the trial court entered a restitution order requiring the Defendant to pay restitution in the amount of $99,017.78 with a payment schedule of $50 per month for the length of his probationary sentence, which the trial court determined to be six years.  On appeal, the Defendant argues: (1) the trial court erred ordering him to pay nearly $100,000 in restitution and to pay $50 per month over the term of his probation; and (2) no amount of restitution is appropriate because his Social Security benefits are exempt from court-ordered collection under 42 U.S.C. § 407(a) and that even if his benefits are not exempt, he does not have the ability to pay any amount toward restitution.  We reverse the judgment of the trial court as to restitution and remand this case for entry of a corrected judgment of conviction and probation order and for a new restitution hearing consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed
and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

C. Richard Hughes, Jr., District Public Defender; M. Todd Ridley (on appeal) and Tammy Harris-Crayne (at guilty plea and restitution hearing), Assistant Public Defenders, for the Defendant-Appellant, Raymond Brandon Saffles.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Clay Collins and Dorothy Cherry, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Guilty Plea Hearing.** The Defendant was charged by criminal information with one count of arson on December 11, 2019, and he entered a guilty plea to this charge on the same date. Pursuant to his plea agreement, the Defendant was to receive a sentence of "6 yrs susp[ended] after 364 days in Monroe County Jail," the Defendant was to have no contact with the victim, Belinda Hawkins, or her property, and the Defendant's restitution would "be determined."

At the December 11, 2019 plea submission hearing, defense counsel informed the trial court that the Defendant had "some learning disorders" and "other diagnoses." She noted that the Defendant had recently completed a mental evaluation in an unrelated aggravated assault case in General Sessions that was ultimately dismissed, where the Defendant had been found "competent and sane." Defense counsel said that the Defendant had been scheduled for another competency evaluation in the present case but it had not been done because the other evaluation had been recently completed. The trial court responded that it would try to explain everything in a way that the Defendant could understand and specifically asked the Defendant to let the court know if he had any questions.

The trial court informed the Defendant of his rights, his charge, and the punishment he was facing. It noted that the Defendant had already served three months and that he had "about nine months more to do in the jail less any good behavior credits[.]" When the trial court recognized that the Defendant had "no job and no income," the Defendant said that he used to receive a disability check but those checks had stopped coming when he went to jail. The State then provided a factual basis for the plea, stating that on September 12, 2019, the Monroe County Sheriff's Department had responded to a structure fire of a barn that was engulfed in flames; that Belinda Hawkins, the barn's owner, had told law enforcement that she believed the fire had been started by her tenant, the Defendant, who was upset about being evicted; and that the Defendant, when brought in for questioning, had confessed to setting the barn on fire. The Defendant said he wished to enter a guilty plea to the arson offense, and the trial court ultimately accepted his guilty plea, finding that the Defendant was "legally competent to enter this plea" and that he had "freely and voluntarily" entered it.

The court announced that it was going to "accept th[e] sentencing structure" set out in the plea agreement and that it was sentencing the Defendant "to the Tennessee

- 2 -

Department of Correction[], the penitentiary, for a six-year sentence," but that it was "going to order" that he serve "364 days . . . in the jail, less [his] pretrial jail credit and any good time credits" and then would "allow [him] to serve six years on probation"  The court also told the Defendant that while on probation, he had to pay the court costs of the action and could have "absolutely no contact with Ms. Hawkins or her property."  The trial court informed the Defendant that his next court date was February 14, 2020, during which the court would determine the issue of restitution.

On December 11, 2019, a judgment of conviction was entered, showing that the Defendant had entered a guilty plea to arson, that he would receive a sentence of six years, that he would serve 364 days of incarceration in the Tennessee Department of Correction before serving six years on supervised probation, that he would have no contact with Belinda Hawkins or her property, and that "[r]estitution [would] be determined by the Court on February 14, 2020."  Also on December 11, 2019, a probation order was entered, stating that although the Defendant had been convicted of the offense of arson and had been sentenced to serve "a term of 6 years in the Tennessee Department of Correction," the sentence was suspended and the Defendant was placed on supervised probation for a period of 6 years.  One of the conditions of the Defendant's probation was that he "pay all imposed fines, court costs, and restitution" ordered by the trial court.

**Restitution Hearing.**  At the August 17, 2020 restitution hearing, Belinda Hawkins testified that her sixty-year-old "historic, solid oak, two-story tobacco barn" was "completely destroyed" by the fire set by the Defendant. Ms. Hawkins stated that her insurance company appraised the cost of replacing the barn structure with "subpar materials" to be around $100,000.  She also estimated the value of the barn's contents to be around $100,000, for a total of approximately $200,000.  She said that because her insurance had paid approximately 40% of this $200,000 total value, she was asking for $120,000 in restitution.

Ms. Hawkins said that although her insurance company determined the "replacement cost value" of the barn structure to be $93,187.78, she had only received an insurance payment of $12,270.00 to cover the barn structure.  Documentation from Ms. Hawkins's insurance company, which supported the aforementioned appraisal amount and insurance payment for the barn structure, was admitted into evidence.  Ms. Hawkins also said that while her insurance company valued the contents of her barn to be $88,100, she had only received an insurance payment of around $40,000, although she had an opportunity to receive an additional $30,000 from her insurance company as she replaced some of the destroyed items over time.  No documentation was admitted into evidence concerning the appraised value of the contents of the barn, the money paid by insurance for the barn's contents, or the possibility of receiving additional insurance money for the replacement of items destroyed.

- 3 -

Raffaele Stellato, Ms. Hawkins fiancé, was accepted as an expert in construction. He testified that Ms. Hawkins' barn had been constructed of solid oak, which was expensive to replace. He also said that a new metal roof had been put on the barn recently and that one side of the barn had been rebuilt the year before the fire. Mr. Stellato estimated that to rebuild the barn out of oak materials would cost between $115,000 and $125,000.

Wanda Faye Saffles, the Defendant's grandmother, testified that the Defendant was autistic, had bipolar disorder, suffered from "15 different kinds of seizures," and had an anger disorder. She stated that she had adopted the Defendant when he was two years old and had been his primary caretaker ever since. Because of his medical conditions, the Defendant had received Social Security benefits from the age of two years old. Ms. Saffles said she was told the Defendant received these benefits because "he would never be able to hold down a job and because of the seizures and the other problems that he has." She stated that the Defendant had never been employed.

Ms. Saffles explained that the Defendant's Social Security benefits were his only source of income and that the Defendant did not receive food stamps. When asked how much money the Defendant received in Social Security benefits each month, Ms. Saffles replied, "It was cut down to $450 then . . . they were talking about in September the 1st [sic] it would be cut down to [$]350." She said these Social Security benefits were paid directly to her as the protective payee for the Defendant.

Ms. Saffles asserted that the Defendant's Social Security benefits were used to pay his monthly expenses, which she estimated to be the following:

| Rent | $175 |
| Food | $200 |
| Utilities | $67 |
| Medication | $30 |
| Total | $472 |

She stated that after paying all of the aforementioned expenses, the Defendant had a "[v]ery little bit" left from his Social Security check each month, which "average[d] about—maybe $50." She confirmed that the Defendant was currently unable to work.

Ms. Saffles claimed that the barn the Defendant had burned down was in "very poor" condition. She asserted that Belinda Hawkins had talked about having the barn torn down and another one built because the roof leaked and the barn had holes in it. Ms. Saffles said that the last time she was inside the barn, which was the day it burned down, the antique items inside it were all broken, and the barn did not contain heavy farm equipment.

- 4 -

She claimed that many of the items stored inside the barn had been collected by Ms. Hawkins from a nearby landfill.

Ms. Saffles said she was unsure why the Defendant's Social Security benefits were being reduced. She noted that when the Defendant got out of jail on September 9, 2019, for an unrelated offense, he "thought he could take care of his own money[,]" and he did not know where she was because she "had been without a phone for two months." She said that the Defendant had gone to stay "with someone else," who told him that because he did not have a family member to assist him, his benefits would go through a "company[,]" and [this company] would take a percentage." Ms. Saffles said that when she called Social Security, she was told only that the Defendant's check would be "cut down[,]" but she did not know why. When she was asked if the Defendant had received a Social Security check since his release from jail on September 9, Ms. Saffles replied, "Not that I know of. We haven't got[ten] anything." She confirmed that the Defendant had no income as of the date of the restitution hearing. She stated that although she had called several times, Social Security told her that "as of September the 1st [sic], that [she] should be getting a check of $350 for him" Ms. Saffles said that with the $100 reduction to his Social Security benefit, the Defendant would have no money left after paying his expenses.

The Defendant, Raymond Brandon Saffles, testified that he was twenty-three years old and that after entering his guilty plea to arson, he had spent 364 days in jail for this offense. He confirmed that at the age of two years old he was diagnosed with autism, bipolar disorder, and an anger disorder. He stated that his Social Security benefits were his only source of income but asserted that he had not received any Social Security checks since his release from jail. He also said that because of his various medical conditions, he was unable to work. The Defendant maintained that although he had received a copy of the June 5, 2020 letter from the Social Security Administration's "Retirement, Survivors and Disability Insurance," stating that he would receive a monthly Social Security benefit of $453.00 around July 2020, he never received this money "because it went to someone else." A June 5, 2020 letter from the Social Security Administration was admitted into evidence. This letter, which was made out to "Wanda Moses for Raymond B. Saffles" stated that based on the information the Administration had, Social Security could "pay benefits beginning June 2020[,]" that Social Security benefits for a given month were paid the next month, that the Defendant would "receive $453.00 for June 2020 around July 2, 2020[,]" that "[a]fter that[,]" the Defendant would "receive $453.00 on or about the third of each month[,]" and that the Defendant had "the right to appeal" if he disagreed with this decision.

The Defendant stated that he had "no income whatsoever" that would enable him to pay the victim in this case. He described Ms. Hawkins' barn as a "old rickety shack" and said that on the day he burned this barn, the only things inside were "old junk" and "some

old broken antiques." He said that the barn's second floor had some holes where a person could fall through. The Defendant claimed there was "never any farm equipment" in the barn and that if there had been farm equipment inside, "it would have been left after the fire." Although the Defendant stated that he had never worked, he acknowledged, "[W]hen you're autistic and you like something, you . . . learn all about it you can." The Defendant also admitted that he helped his grandmother with "stuff around the house" like "cleaning" and "moving stuff."

At the conclusion of the hearing, the State asked that the victim be awarded the full amount of restitution she had requested:

> Your Honor, the State is just asking for the Court to award the amount of restitution that the victim is asking for[,] understanding that that may not result in full payment over the time of the probationary period. However, it can be converted into a civil judgment at the end of the time period and would keep the victim from having to file a civil lawsuit to try to obtain these damages.
>
> [The Defendant] is very young. It sounds like he does have certain abilities and things that he can do that he can learn. And so his potential . . . earnings in the future could be better than they are today. As well as there's always a chance that he could come into money by some other means and so we would like there to be a judgment reflecting the proper amount that is owed to the victim to make her whole.

Defense counsel responded that "the Court must show that the defendant can reasonably pay an order of restitution and . . . it cannot be more than he's able to pay." She added that the defense had presented evidence showing that the Defendant received between $350 and $450 a month in Social Security benefits and that "all of that money is used for his livelihood." She also noted that the Defendant had already served "a year of his life in jail" as punishment in this case. Defense counsel then stated, "If [Ms. Hawkins] wants to try to go after a civil judgment, I understand that, Your Honor, but at this point, he's judgment proof." She added that there was "no reasonable amount that [the Defendant] can pay within these six years to make [Ms. Hawkins] whole."

In determining the issue of restitution, the trial court recognized that "restitution must be reasonable" and that "the Court cannot establish a payment schedule that extends beyond the maximum term of probation that could have been imposed for the offense." With regard to the claim that the Defendant's monthly Social Security check had been reduced to $350 per month, the court noted that the Defendant "obviously did not remove [Ms. Saffles, his grandmother,] as protective payee, at least from this June notice from the

- 6 -

Social Security money" and that while the Defendant potentially brought in a third-party company that was taking a fee toward the management of the Defendant's money, "[t]hat was not clearly established." The trial court noted that although there had been conflicts between the State and defense witnesses regarding the condition of the barn and the value of the contents and equipment that was inside, it ultimately "accredit[ed] the testimony of the victim over the defendant."

The court made findings regarding the monetary damage sustained by Ms. Hawkins as a result of the Defendant's actions and the insurance proceeds, which were as follows:

| Replacement Value of Barn | $93,187.78 |
|---|---|
| (Less Insurance Proceeds) | ($12,270.00) |
| Value of Interior Contents | $88,100.00 |
| (Less Insurance Proceeds) | ($70,000.00) |
| Total | $99,017.78 |

Accordingly, the trial court set restitution in the amount of $99,017.78. The court then stated, "Given [the Defendant's] ability to pay, the Court is going to order that the $50 he has left over each month be attributed toward a monthly payment each and every month for the balance of his sentence." The trial court ordered that $45 of each $50 monthly payment be applied to restitution and that the remaining $5 go toward court costs. When defense counsel asked if the $50 per month would only last for the term of the Defendant's probation, which was "five years left[,]" the trial court stated:

Let me look at the judgment because sometimes they say—this says the judgment that was entered in this case was dated December 11[], 2019. And [the Defendant] was sentenced to the Tennessee Department of Correction[] for a period of six years. He was ordered to serve 364 days in the jail. And then he was placed on probation for a period of six years. So I read this to say a six-year sentence is allowed to be served on probation for six years after he serves 364 days in the jail. So it's actually a six-year sentence times 12 months in a year times $50. Whatever that comes to is what I'm setting his payments.

On August 17, 2020, the trial court entered a written "Order for Restitution," which stated:

Upon good cause and/or upon hearing before this Honorable Court it is found that the above-referenced defendant shall pay restitution to the victim(s) in this case:

- 7 -

IT IS HEREBY ORDERED that the defendant shall pay through the clerk of this court; the below named party or parties, the full amount of restitution shown:

Belinda Hawkins
Costs $5.00
Victim $45.00

Def. to pay $50.00 per month for length of sentence.

The total amount of restitution is $99,017.78.

On August 24, 2020, the Defendant timely filed a notice of appeal.

## ANALYSIS

**I. Total Restitution Amount and Payment Schedule.** The Defendant argues that the trial court erred in ordering the Defendant to pay $99,017.78 in restitution at the rate of $50 per month over his six-year probationary term. First, the Defendant claims that the trial court failed to make any findings suggesting that he has the ability to satisfy a nearly $100,000 restitution order, given that he is severely autistic and his only source of income is from his Social Security benefits. Second, the Defendant asserts that the payment plan ordered by the trial court, which requires him to pay $50 per month for the duration of his probation, will not satisfy the entire restitution award prior to the expiration of his sentence. The Defendant contends that both of these errors, whether taken separately or together, require a reversal of the trial court's restitution order. In response, the State concedes that "the restitution order should be reversed" because "the full restitution amount of $99,000 is not an amount that the court found Defendant could reasonably pay during the course of his sentence." We conclude that the trial court abused its discretion by not making appropriate findings regarding the victim's pecuniary loss or the Defendant's financial resources and future ability to pay and by not basing the total restitution award on what the Defendant can reasonably pay during the time period that he is under the trial court's jurisdiction.

Initially, we note that this court has jurisdiction to hear the case because the Defendant's judgment of conviction, which referenced a later restitution hearing, and the resulting restitution order constitute a "final judgment" appealable pursuant to Tennessee Rule of Appellate Procedure 3. See State v. David Allen Bohanon, No. M2012-02336-CCA-R3-CD, 2013 WL 5777254, at *4 (Tenn. Crim. App. Oct. 25, 2013) (holding that the judgments of conviction and the later restitution order constituted a "final judgment"

- 8 -

appealable pursuant to Rule 3, where the judgments of conviction specifically referenced a later restitution hearing and resolved all sentencing issues other than the amount of restitution owed and the payment schedule); see also State v. Zachary Ross Hendrixson, No. M2013-01539-CCA-R3-CD, 2014 WL 991921, at *3 (Tenn. Crim. App. Mar. 13, 2014) (concluding that the judgment of conviction and the resulting restitution order constituted a "final judgment" because the judgment of conviction stated that the restitution hearing would be held at a later date); State v. William Chander Daniels, No. E2009-02172-CCA-R3-CD, 2010 WL 5343776, at *2 (Tenn. Crim. App. Dec. 23, 2010) (stating that "between the judgment of conviction, which references a later restitution hearing, and the order emanating from that hearing, the record contains a 'final order' and provides a sufficient basis to invoke our jurisdiction").

We also detect some clerical errors in the Defendant's judgment of conviction. The transcript from the plea submission hearing shows that the trial court accepted the terms of the Defendant's plea agreement, which provided that the Defendant would receive a sentence of "6 yrs susp[ended] after 364 days in Monroe County Jail[.]" Based on our review of the record as a whole, we interpret the Defendant's plea agreement to provide for an effective sentence of six years in the Tennessee Department of Correction, suspended to split confinement with the Defendant serving 364 days in the Monroe County Jail before serving the remaining five years of his sentence on supervised probation. See Tenn. Code Ann. § 40-35-306(a) ("A defendant receiving probation may be required to serve a portion of the sentence in continuous confinement for up to one (1) year in the local jail or workhouse, with probation for a period of time up to and including the statutory maximum time for the class of the conviction offense."); Tenn. Code Ann. § 40-35-314 (stating that when a sentence involves "split confinement not to exceed one (1) year, the court shall designate the place of confinement as a local jail or workhouse"). However, the judgment of conviction in this case reflects that the Defendant actually received an effective sentence of seven years, with service of 364 days in confinement before serving six years on supervised probation, which was one year longer than the probationary sentence specified in the Defendant's plea agreement. Once a plea agreement is approved by the trial court, it becomes a binding and enforceable contract. See State v. Howington, 907 S.W.2d 403, 407 (Tenn. 1995); see Tenn. R. Crim. P. 11(c)(4) ("If the court accepts the plea agreement, the court shall advise the defendant that it will embody in the judgment and sentence the disposition provided in the plea agreement."). Pursuant to the Defendant's plea agreement, the only item to be determined by the trial court was the amount of restitution and payment schedule. Therefore, when the trial court accepted the Defendant's guilty plea, it was bound by all of the terms of the plea agreement, including the length of the sentence and the amount of time spent on supervised probation. Accordingly, we remand the case to the trial court for entry of a corrected judgment form, reflecting an effective sentence of six years in the Tennessee Department of Correction, suspended to split confinement with the Defendant serving 364 days in the Monroe County Jail before

serving the remaining five years of his sentence on supervised probation. The details of the suspended sentence should be noted in the "Special Conditions" section of the judgment form. We also remand for a corrected probation order, reflecting a probationary term of five years.

When a defendant challenges a trial court's restitution order, this court applies an abuse of discretion standard of review with a presumption that the trial court's ruling was reasonable. David Allen Bohanon, 2013 WL 5777254, at *5 (relying on State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012), and State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012), in concluding that "the appropriate standard of review for restitution orders is the abuse of discretion standard with a presumption of reasonableness"); see Tenn. Code Ann. § 40-35-104(c)(2) (stating that the payment of restitution is a sentencing alternative for eligible defendants). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." State v. Phelps, 329 S.W.3d 436, 443 (Tenn. 2010). A defendant bears the burden of demonstrating the impropriety of a sentence. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A defendant convicted of a felony or misdemeanor may be ordered to pay restitution to a victim in addition to serving a sentence of continuous confinement in a local jail or workhouse in conjunction with a term of probation. Tenn. Code Ann. § 40-35-104(c)(2), (5). "The purpose of restitution is not only to compensate the victim but also to punish and rehabilitate the guilty." State v. Johnson, 968 S.W.2d 883, 885 (Tenn. Crim. App. 1997); see State v. Lewis, 917 S.W.2d 251, 257 (Tenn. Crim. App. 1995) ("Restitution in the criminal justice system is warranted only when it serves rehabilitation and deterrent purposes.").

While there is no set formula for determining restitution, the amount of restitution must be reasonable. State v. Smith, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). In ordering restitution, the trial court must consider the victim's "pecuniary loss." Tenn. Code Ann. § 40-35-304(b), (e); Smith, 898 S.W.2d at 747. However, the amount of restitution ordered "'does not have to equal or mirror the victim's precise pecuniary loss.'" State v. Mathes, 114 S.W.3d 915, 919 (Tenn. 2003) (quoting Smith, 898 S.W.2d at 747). "Pecuniary loss" is defined as "[a]ll special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant" and "[r]easonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense[.]" Tenn. Code Ann. § 40-35-304(e)(1)-(2). "Special damages" are "'the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence

in the particular case . . . .'" Lewis, 917 S.W.2d at 255 (quoting Black's Law Dictionary 392 (6th ed. 1990)).

In addition, "the court shall consider the financial resources and future ability of the defendant to pay or perform" when determining "the amount and method of payment" of restitution. Tenn. Code Ann. § 40-35-304(d); see State v. Bottoms, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001). Consideration of financial resources and future ability to pay is reasonable because "[a]n order of restitution which obviously cannot be fulfilled serves no purpose for the appellant or the victim." Johnson, 968 S.W.2d at 886.

In ordering restitution, the trial court must specify "the amount and time of payment" of the restitution and "may permit payment or performance in installments." Tenn. Code Ann. § 40-35-304(c). However, the trial court may not establish a payment or performance schedule that extends beyond the expiration date of a defendant's sentence. Id. § 40-35-304(g)(2). Accordingly, the trial court must set a total restitution amount that a defendant can reasonably pay within the time period that he or she will be under the jurisdiction of the trial court. Smith, 898 S.W.2d at 747.

Upon a petition from a defendant, victim, or district attorney, the trial court may waive, adjust, or modify its restitution order at any time:

> A defendant, victim or district attorney general at any time may petition the sentencing court to adjust or otherwise waive payment or performance of any ordered restitution or any unpaid or unperformed portion of the restitution. The court shall schedule a hearing and give the victim and the defendant notice of the hearing, including the date, place and time and inform the victim and defendant that each will have an opportunity to be heard. If the court finds that the circumstances upon which it based the imposition or amount and method of payment or other restitution ordered no longer exist or that it otherwise would be unjust to require payment or other restitution as imposed, the court may adjust or waive payment of the unpaid portion of the restitution or other restitution or modify the time or method of making restitution. The court may extend the restitution schedule, but not beyond the term of probation supervision.

Tenn. Code Ann. § 40-35-304(f) (emphasis added). Upon expiration of the time of payment or the payment schedule imposed, any unpaid part of the restitution may be converted to a civil judgment following service of notice to the defendant and a hearing, during which the victim and the defendant may offer proof as to the amount of restitution actually paid. Id. § 40-35-304(h)(1)-(7); Bottoms, 87 S.W.3d at 108.

The Defendant argues that although the trial court heard substantial proof regarding his financial condition, it failed to make any findings suggesting that he had the ability to pay $100,000 in restitution over his probationary period. He claims that the trial court's restitution award cannot be reconciled with his financial condition, given that he is a twenty-three-year-old man with severe disabilities that prevent him from working. He notes that his finances are handled by his grandmother, his primary caretaker, and that he receives, at most, $450 per month in Social Security income. The Defendant asserts that when his Social Security benefits are balanced against his expenses of approximately $471 per month, he simply cannot be expected to pay $100,000 in restitution, no matter how long his probationary sentence lasts.

The Defendant also contends that the trial court abused its discretion in ordering a payment schedule of $50 per month that would not satisfy the total restitution award prior to the end of his six-year probationary term. See Tenn. Code Ann. § 40-35-304(g)(2). The Defendant suggests that the trial court, at the State's urging, attempted to set a restitution amount that could be converted to a civil judgment at a later date. However, he insists that a trial court "cannot simply set an amount with the assumption that the criminal judgment will be converted into a civil judgment at the conclusion of the defendant's probation." See David Allan Bohanon, 2013 WL 5777254, at *8 ("While it is true that any unpaid portion of court-ordered restitution may be converted to a civil judgment, the amount ordered in the first place must be reasonable and in accordance with statutory requirements."); State v. Terence Alan Carder, No. W2009-01862-CCA-R3-CD, 2010 WL 5272938, at *6 (Tenn. Crim. App. Dec. 10, 2010) ("[T]he trial court's reliance upon the portion of the statute which allows for conversion of an unpaid restitution amount to civil judgments is misplaced" because this statute "was not intended to serve as a 'free pass' in civil court to ensure a judgment of loss."); State v. James Allen Ballew, No. M2016-00051-CCA-R3-CD, 2017 WL 1103034, at *3 (Tenn. Crim. App. Mar. 24, 2017) ("The trial court also erred in relying on the portion of the statute that allows for the conversion into a civil judgment of any amount of restitution that is left unpaid at the expiration of a defendant's sentence. That statutory provision does not release a trial court from the obligation to set an amount of restitution and payment terms that the defendant can reasonably be expected to satisfy."). The Defendant maintains that the trial court, and the State, ignored this well-established precedent when it "set restitution with an eye toward[] a later civil judgment rather than basing it on what [the Defendant] could feasibly pay prior to the end of his sentence."

As an initial matter, we agree with the Defendant that the trial court never made any findings that he had the ability to pay nearly $100,000 in restitution. As we have already recognized, the trial court should have ordered the Defendant to serve a sentence of five years on supervised probation pursuant to the Defendant's plea agreement, and we have remanded the case for correction of that error. In any case, the trial court ordered the

Defendant to pay a total restitution amount of $99,017.78 and then ordered the Defendant to pay $50 per month[1] during his six years of supervised probation, which totals only $3600, far less than the full restitution amount ordered by the trial court. "This created a situation in which the Defendant could comply with the order of restitution by making the minimum payments" of $50 per month "while simultaneously violating the order by not paying the full amount" of $99,017.78 by the end of his probationary sentence. State v. Ida Veronica Thomas, No. M2019-02137-CCA-R3-CD, 2021 WL 286736, at *7 (Tenn. Crim. App. Jan. 28, 2021); see David Allan Bohanon, 2013 WL 5777254, at *8 (concluding that that the trial court erred in ordering the defendant to pay restitution of $16,575 at a rate of $200 per month over the defendant's three-year sentence); State v. Darren Eugene Fleshman, No. E2013-00557-CCA-R3-CD, 2014 WL 2804183, at *10 (Tenn. Crim. App. June 18, 2014) (recognizing that "in setting a minimum payment of $50 per month, the trial court established a payment schedule which would not have resulted in payment of the restitution amount of [$42,815.93] in full by the end of the [four-year] term."); State v. Daniel Lee Cook, No. M2004-02099-CCA-R3-CD, 2005 WL 1931401, at *4 (Tenn. Crim. App. Aug. 10, 2005) (holding that it would be impossible for the defendant to pay off the $9,000 in restitution at a rate of $150 per month over the course of his sentence of eleven-months and twenty-nine days).

Additionally, while the unpaid portion of the restitution may be converted to a civil judgment, Tenn. Code Ann. § 40-35-304(h)(1); Bottoms, 87 S.W.3d at 108, the total restitution amount ordered by the trial court must be reasonable and must comply with the statutory requirements, Tenn. Code Ann. § 40-35-304(d), (g)(2); Johnson, 968 S.W.2d at 886; Smith, 898 S.W.2d at 747. As another panel of this court aptly noted, "It is important for trial courts to distinguish between the victim's pecuniary loss and the restitution amount ordered after consideration of a defendant's financial resources and ability to pay." Ida Veronica Thomas, 2021 WL 286736, at *7; see State v. Comer, 278 S.W.3d 758, 761 (Tenn. 2008) (holding that in setting restitution, "the sentencing court must consider not only the victim's loss but also the financial resources and future ability of the defendant to pay").

Here, the trial court simply accepted, without question, Ms. Hawkins' testimony regarding her pecuniary loss, even though no documentation was presented regarding an appraisal of the barn's contents or any insurance payments received for the barn's contents. Thereafter, the trial court did not make appropriate findings of fact regarding the Defendant's financial resources and future ability to pay, especially given Ms. Saffles' conflicting testimony regarding the Defendant's ability to pay restitution and the amount of the Defendant's Social Security benefits. Lastly, the trial court set the total restitution

---

[1] The Defendant was ordered to pay $50 per month, of which $5.00 would be applied to court costs and the remaining $45.00 would be applied to restitution.

- 13 -

award at nearly $100,000 without basing this figure on what the Defendant could be reasonably expected to pay over the time period that he is under the court's jurisdiction. For all these reasons, we conclude that the trial court abused its discretion in entering the Defendant's restitution order.

Because the trial court did not make appropriate findings regarding the victim's pecuniary loss or the Defendant's financial resources and future ability to pay and did not base the total restitution award on what the Defendant can reasonably pay during the time period that he is under the jurisdiction of the trial court, we reverse the trial court's restitution order and remand the case for a new restitution hearing. Prior to this hearing, the trial court "shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss." Tenn. Code Ann. § 40-35-304(b); see State v. Tyson B. Dodson, No. M2018-01087-CCA-R3-CD, 2019 WL 3946097, at *3 (Tenn. Crim. App. Aug. 21, 2019). At the new restitution hearing, detailed evidence and testimony must be presented regarding the victim's pecuniary loss, including any available appraisals and insurance payments for both the barn structure and its contents, and regarding the Defendant's financial resources and future ability to pay. Based on this evidence, the trial court must then make appropriate findings of fact regarding the victim's pecuniary loss as well as the Defendant's financial resources and future ability to pay restitution, which will provide a clearer picture of the Defendant's overall financial situation. If, at the conclusion of this hearing, the trial court finds that it is appropriate to order the Defendant to pay restitution, then the court must set a restitution amount based on the Defendant's ability to pay and must establish a payment schedule that can be completed during the term of the Defendant's probationary period. In addition, the restitution order must comply with the requirements specified in the following section. Following entry of any such restitution order, the Defendant, the victim, or district attorney may petition the trial court at any time to waive, adjust, or modify this restitution order.

**II. Social Security Benefits as Payment of Restitution.** Next, the Defendant argues that because of his financial condition, "no amount of restitution is appropriate." He asserts that his monthly Social Security benefit, which is his only source of income, is exempt under 42 U.S.C. § 407(a) from court-ordered collection efforts and that the trial court's restitution order, which compels him (via the threat of revocation and imprisonment) to use his Social Security benefit to satisfy this restitution obligation, violates that law. Alternatively, he contends that even if his Social Security income is subject to court-ordered collection, he does not have any ability to pay any amount toward restitution. Accordingly, the Defendant asks this court to remand his case for entry of an amended judgment with a restitution amount of $0.00.

The State responds that 42 U.S.C. § 407(a) does not preclude consideration of Social Security income in imposing restitution and argues that the trial court's finding that the

Defendant had the ability to pay $50 in monthly restitution was supported by substantial evidence at the restitution hearing. Both parties acknowledge that whether Social Security benefits are exempt from restitution orders pursuant to 42 U.S.C. § 407(a) appears to be an issue of first impression in Tennessee. We conclude, as explained below, that the restitution order in this case, which imposed the restitution obligation but did not compel satisfaction of this obligation, does not qualify as "other legal process" prohibited by 42 U.S.C. § 407(a). Although we have already concluded that a remand is appropriate in this case, we will address the issues in this section because they will likely arise again on remand.

As an initial matter, the State asserts that the Defendant "partially waived" this issue, claiming that while the Defendant objected to the imposition of any restitution on the basis that all of his income was used for basic living expenses, the Defendant never argued that the Social Security Act would prevent the court from imposing a restitution order. In short, the State maintains that because the Defendant raised the 42 U.S.C. § 407(a) issue for the first time on appeal, this court should treat it as waived and review this issue for plain error only. See State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) ("Ordinarily, issues raised for the first time on appeal are waived."). In response, the Defendant insists that the State's "quasi-waiver argument" should be rejected because he argued that he lacked the ability to pay restitution and presented proof that his monthly Social Security check was his sole source of income, thereby invoking federal law. See State v. Harbison, 539 S.W.3d 149, 165-66 (Tenn. 2018) (recognizing that a reviewing court should not "exalt form over substance" when determining whether an issue is waived); Fahrne v. SW Mfg., Inc., 48 S.W.3d 141, 143 n.1 (Tenn. 2001) (noting that "the failure to use the right label does not result in a waiver"). Because our review of the record shows that the Defendant adequately preserved this issue, we will address it on the merits.

First, the Defendant asserts that his social security benefits are exempt from restitution orders pursuant to 42 U.S.C. § 407(a) of the Social Security Act, also known as the Act's "antiattachment" provision, which states,

> The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law."

42 U.S.C. § 407(a) (emphasis added).  The Defendant argues that because the trial court's restitution order qualifies as "other legal process" under this statute, it cannot be used to compel payment of the Defendant's Social Security benefit.

In determining this issue, we note that an individual may receive federal money under one of two titles of the Social Security Act:  (1) Title II, 49 Stat. 622, as amended, 42 U.S.C. § 401 et seq., which is the Old-Age, Survivors, and Disability Insurance (OASDI) plan of benefits for elderly and disabled workers, and their survivors and dependents; or (2) Title XVI of the Act, 42 U.S.C. § 1381 et seq., which is the Supplemental Security Income (SSI) plan of benefits for aged, blind, or disabled individuals, including children, whose income and assets fall below certain levels.  See Washington State Dept. of Social and Health Services v. Guardianship Estate of Keffeler, 537 U.S. 371, 375 (2003).  The record, although fairly limited on this issue, indicates that the twenty-three-year-old Defendant in this case was receiving disability benefits under the OASDI plan.  See 42 U.S.C. § 423(d)(1)(A) (stating that the term "disability" means "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months").

The Defendant cites three cases in support of his claim that the restitution order in this case violates 42 U.S.C. § 407(a):  City of Richland v. Wakefield, 380 P.3d 459 (Wash. 2016); State v. Eaton, 99 P.3d 661 (Mont. 2004); and In re Lampart, 856 N.W.2d 192 (Mich. Ct. App. 2014).  In Wakefield, 380 P.3d at 465-66, the Washington Supreme Court vacated the trial court's order from the fine review hearing, which required the appellant "to turn over $15 from her social security disability payments each month"[2] to pay her outstanding legal financial obligations (LFOs), because this order met the definition of "other legal process" in 42 U.S.C. § 407(a).  The court held that "federal law prohibits courts from ordering defendants to pay LFOs if the person's only source of income is social security disability."  Id. at 466.

_____

[2] Significantly, the appellant in Wakefield did not appeal the trial court's original decision imposing her costs but did appeal the trial court's refusal to remit her costs based on her inability to pay at the fine review hearing, which was "essentially a contempt proceeding."  380 P.3d at 462.  After the appellate briefs were filed, the two municipalities involved filed a motion to strike oral argument and to remand the case to the trial court for entry of an order remitting the appellant's legal financial obligations (LFOs) after concluding that there was "no good faith legal argument" to be made opposing the appellant's request for entry of an order remitting her remaining LFOs.  Id. at 463.  However, the two municipalities asked the Washington Supreme Court to issue an appeal on the merits for the benefit of other similarly situated individuals.  Id.  The Washington Supreme Court ultimately held that the trial court did not apply the "manifest hardship" standard required by state law, that the trial court failed to properly analyze the effect of the appellant's disabilities and homelessness on her ability to pay, that the trial court's order violated the antiattachment provisions of the Social Security Act, and that the trial court's order was based on findings of fact that were not supported by substantial evidence.  Id. at 463-67.

- 16 -

In <u>Eaton</u>, 99 P.3d at 664, 666, the Montana Supreme Court held that the trial court erred in ordering Eaton, as a condition of his suspended sentence, "to pay restitution and fees totaling $114,520.32" and "to make payments equal to 20 percent of his net income per month, from any source, including money received from his social security benefits," because "the judgment's inclusion of Eaton's social security income conflicts with the provisions of [42 U.S.C.] § 407(a)" and amounted to an "improper attempt to subject Eaton's social security benefits to 'other legal process.'"

Finally, in <u>In re Lampart</u>, 856 N.W.2d at 203, which we will explore in greater depth below, the Michigan Court of Appeals held that 42 U.S.C. § 407(a) precludes the trial court from using a finding of contempt to reach the appellant's Social Security Disability Insurance (SSDI) benefits, stating, "[The appellant's] receipt of SSDI benefits does not immunize her from the restitution order; rather, it merely prohibits the trial court from using legal process to compel satisfaction of the restitution order from those benefits."

Here, the Defendant urges this court to reach the same conclusion as the aforementioned state courts in Michigan, Montana, and Washington because he claims the restitution order in this case is clearly a "judicial mechanism" with the primary function of "of compelling payment of [the Defendant's] Social Security benefits to another." Although the Defendant acknowledges that this restitution order does not attach his social security benefits with the same immediacy of a garnishment or levy, he nevertheless claims that this order poses an even more severe threat because if he misses even one monthly payment, the trial court has the power to revoke his probation and order him to serve his entire sentence in confinement. He claims the effect of the trial court's restitution order is that he "must use his Social Security benefits to pay court-mandated restitution or else face imprisonment," which is precisely what Section 407(a) precludes. See <u>Philpott v. Essex Co. Welfare Bd.</u>, 409 U.S. 413, 417 (1973).

The State responds that this court should follow the reasoning in <u>In re Lampart</u>, 856 N.W.2d 192 (Mich. Ct. App. 2014). While the State asserts that 42 U.S.C. § 407(a) does not immunize the Defendant from this restitution order, it recognizes that "[f]uture actions taken to enforce this order might run afoul of -407(a)" if the facts show that the trial court is targeting funds dispersed through Social Security. The State insists that "the imposition of an obligation along with the specter of enforcement does not pass control over property from one person to another and does not constitute 'other legal process' for purposes of the statute at issue." Consequently, the State contends that the restitution order in this case does not violate 42 U.S.C. § 407(a).

Because it is apparent that the Defendant's benefits in this case are not being subjected to the formal procedures of "execution, levy, attachment, [or] garnishment,"[3] we must determine whether the restitution order constitutes "other legal process" pursuant to 42 U.S.C. § 407(a). Accordingly, we must start with the pivotal United States Supreme Court case on this issue, Washington State Dept. of Social and Health Services v. Guardianship Estate of Keffeler, 537 U.S. 371 (2003).

In Keffeler, the United States Supreme Court determined whether the Washington State Department of Social and Health Services' use of Social Security benefits to reimburse itself for some initial expenditures violated 42 U.S.C. § 407(a), which protects such benefits from "execution, levy, attachment, garnishment, or other legal process." Id. at 375. After recognizing that the department's efforts to use of these benefits did not "even arguably employ" the procedures of execution, levy, attachment, or garnishment, the Keffeler Court considered whether the department's conduct qualified as "other legal process" under 42 U.S.C. § 407(a):

> [T]he case boils down to whether the department's manner of gaining control of the federal funds involves "other legal process," as the statute uses that term. That restriction to the statutory usage of "other legal process" is important here, for in the abstract the department does use legal process as the avenue to reimbursement: by a federal legal process the Commissioner appoints the department a representative payee, and by a state legal process the department makes claims against the accounts kept by the state treasurer. [42 U.S.C. § 407(a)], however, uses the term "other legal process" far more restrictively, for under the established interpretive canons of noscitur a sociis and ejusdem generis, "'[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific

---

[3] The Keffeler Court explained the meaning of the terms execution, levy, attachment, and garnishment, stating: "These legal terms of art refer to formal procedures by which one person gains a degree of control over property otherwise subject to the control of another, and generally involve some form of judicial authorization." 537 U.S. at 383; see Black's Law Dictionary (11th ed. 2019) (defining "execution" as "[j]udicial enforcement of a money judgment, usu[ally] by seizing and selling the judgment debtor's property"); (defining "levy" as "[t]he legally sanctioned seizure and sale of property; the money obtained from such a sale"); (defining "attachment" as "[t]he seizing of a person's property to secure a judgment or to be sold in satisfaction of a judgment" and "[t]he arrest of a person who either is in contempt of court or is to be held as security for the payment of a judgment"); (defining "garnishment" as "[a] judicial proceeding in which a creditor (or potential creditor) asks the court to order a third party who is indebted to or is bailee for the debtor to turn over to the creditor any of the debtor's property (such as wages or bank accounts) held by that third party" and "[t]he judicial order by which such a turnover is effected").

words.'" Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114–115, 121 S. Ct. 1302, 149 L.Ed.2d 234 (2001); see Gutierrez v. Ada, 528 U.S. 250, 255, 120 S. Ct. 740, 145 L.Ed.2d 747 (2000) ("[W]ords . . . are known by their companions"); Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S. Ct. 1579, 6 L. Ed. 2d 859 (1961) ("The maxim noscitur a sociis (3)27 is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress"). Thus, "other legal process" should be understood to be [a] process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability.

Id. at 383-85. The Keffeler court noted that its definition was consistent with the Social Security Commissioner's own definition of "legal process," recognizing, "The Social Security Administration's Program Operations Manual System (POMS), the publicly available operating instructions for processing Social Security claims, defines 'legal process' as used in § 407(a) as 'the means by which a court (or agency or official authorized by law) compels compliance with its demand; generally, it is a court order.'" Id. at 385 (quoting POMS GN 02410.001 (2002), available at http://policy.ssa.gov/poms.nsf/ aboutpoms (as visited Jan. 23, 2003)). The court also observed that in another section, the POMS defined "legal process" as "'any writ, order, summons or other similar process in the nature of garnishment'" and "'may include, but is not limited to, an attachment, writ of execution, income execution order or wage assignment[.]'" Id. (quoting POMS GN 02410.200). The court recognized that "[a]lthough execution, levy, attachment, and garnishment typically involve the exercise of some sort of judicial or quasi-judicial authority to gain control over another's property, the department's reimbursement scheme operates on funds already in the department's possession and control, held on terms that allow the reimbursement." Id. at 386. In determining whether the department's acts involved "other legal process," the court distinguished the cases of Philpott v. Essex County Welfare Bd., 409 U.S. 413 (1973), and Bennett v. Arkansas, 485 U.S. 395 (1988), stating:

> [B]oth Philpott and Bennett involved judicial actions in which a State sought to attach a beneficiary's Social Security benefits as reimbursement for the costs of the beneficiary's care and maintenance. See Philpott, supra, at 415, 93 S. Ct. 590 ("Respondent sued to reach the bank account"); Bennett, supra, at 396, 108 S. Ct. 1204 ("The State filed separate actions in state court seeking to attach Social Security benefits"). In each case, we held that the plain language of § 407(a) barred the State's legal action, and refused to find

- 19 -

an implied exception to the antiattachment provision for a State simply because it provides for the care and maintenance of a beneficiary.  See Philpott, supra, at 416, 93 S. Ct. 590; Bennett, supra, at 397, 108 S. Ct. 1204. Unlike the present case, then, both Philpott and Bennett involved forms of legal process expressly prohibited by § 407(a).

Id. at 388.  After refuting the respondents' argument that permitting a state agency to reimburse itself for the costs of foster care would not be in the best interest of the foster child, the Keffeler court held that the department's use of Social Security benefits for reimbursement did not violate 42 U.S.C. § 407(a).  Id. at 392.

We next consider Reed v. Taylor, 923 F.3d 411, 413 (5th Cir. 2019), wherein the United States Court of Appeals for the Fifth Circuit decided whether a repealed Texas law, which required civilly-committed sex offenders to pay for GPS monitoring or face criminal prosecution, violated 42 U.S.C. § 407(a).  The court, referencing Keffeler, noted that "other legal process" meant a "'process much like the processes of execution, levy, attachment, and garnishment' and so require[d] (1) 'utilization of some judicial or quasi-judicial mechanism,' (2) 'by which control over property passes from one person to another,' (3) 'to discharge or secure discharge of an allegedly existing or anticipated liability.'"  Id. at  416 (quoting Keffeler, 537 U.S. at 385).   The court concluded that the mere threat of prosecution was not "other legal process,"

> Applying Keffeler to this case, the specter of prosecution is not "other legal process."  Although the threat led to a transfer of property, and arguably discharged a Chapter 841 liability, it did not use a judicial or quasi-judicial mechanism.  A threat of future action is not an "exercise of some sort of judicial or quasi-judicial authority to gain control over another's property" as Keffeler puts it.  Congress protected Social Security beneficiaries from judicially enforced transfers, not threats of liability."

Id. at 417 (footnotes omitted).  The court then held that "[c]riminalizing a sexually violent predator's failure to pay for GPS monitoring [wa]s not 'other legal process' under § 407(a)."  Id. at 419.

We also find instructive In re J.G., 434 P.3d 1108, 1109-10 (Ca. 2019), wherein the California Supreme Court considered whether the juvenile court erred in considering J.G.'s Social Security Income (SSI) benefits when determining his ability to pay restitution following the conversion of his restitution order to a civil judgment.  In resolving this issue, the court observed:

"[T]he object of the processes specifically named" in 42 U.S.C. section 407(a)—"to discharge, or secure discharge of, some enforceable obligation" (Keffeler, at p. 386, 123 S. Ct. 1017, italics added)—is different from the object of the process at issue here—to determine in the first instance whether to impose an enforceable obligation, i.e., restitution. Nor does considering SSI benefits in making this determination "involve" an exercise of judicial authority "to gain control over" those benefits, which is the characteristic of the processes 42 U.S.C. section 407(a) specifies—execution, levy, attachment, and garnishment—and on which Keffeler focused. (Keffeler, at p. 386, 123 S. Ct. 1017[).] Under Keffeler, 42 U.S.C. section 407(a) does not preclude a court from considering SSI benefits in determining the ability to pay restitution.

Id. at 1118. After the State conceded at oral arguments that it was reasonable to conclude from the record that the juvenile court improperly considered the social security benefits as the source of the restitution payments and that the correct remedy would be to remand for a new ability to pay hearing, the court reversed the judgment and remanded the case for a new hearing that included "consideration of J.G.'s future earning capacity, his current financial circumstances, and the total amount of restitution to be ordered." Id. at 1120.

We find most persuasive In re Lampart, 856 N.W.2d at 196, wherein the Michigan Court of Appeals determined whether Section 407(a) prohibited a state court from enforcing a restitution order against Lampart's mother, whose sole income was from her Social Security Disability Insurance (SSDI) benefits. Lampart, as a juvenile, entered a plea of admission to arson and was ordered to pay restitution in the amount of $28,210. Id. at 194. The trial court later ordered Lampart's mother, Diana Alexandroni, on behalf of Lampart, to pay restitution of $250 per month. Id. Alexandroni subsequently had a heart attack, which left her unemployed, and her weekly wage garnishment terminated. Id. At a subsequent reimbursement hearing, Alexandroni stated that she was unemployed and that her sole source of income was $730 per month in SSDI benefits. Id. She also argued that under 42 U.S.C. § 407(a), her SSDI benefits were exempt from attachment, garnishment, or other court-imposed obligation and that any attempt to enforce the restitution order would constitute "other legal process" pursuant to 42 U.S.C. § 407(a) and, therefore, would be barred. Id. at 194-95. Thereafter, the trial court concluded that enforcing the restitution order under the juvenile code did not constitute "execution, levy, attachment, garnishment or other legal process" and that it could consider the mother's SSDI benefits as "income" and enforce the restitution order against her personally, through the power of contempt, once the income was in her possession because to hold otherwise would have the effect of making the mother exempt from making payments under the restitution order. Id. at 195. The court later entered an order for reimbursement, requiring Alexandroni to pay $150 per month and continuing until the balance was paid in full. Id.

Thereafter, Alexandroni filed a motion for relief from judgment, seeking to modify or cancel the obligation to make restitution payments, which the trial court denied, stating that "[t]he crux of this case boils down to whether the Court's action in enforcing a restitution order subject to contempt is 'other legal process'" under 42 U.S.C. § 407(a). Id. The trial court, citing Keffeler, then interpreted the term "other legal process" restrictively and remarked that it had "not pursued garnishment or attachment like actions in enforcement." Id. The trial court also noted that Alexandroni had suffered a reduction in household income because the State, with whom her son Lampart was placed, currently received Lampart's SSDI benefits. Id. at 195-96. The court said it would review Alexandroni's monthly payments again at the next review hearing and then denied Alexandroni's motion to modify or cancel her restitution obligation, and Alexandroni appealed. Id.

Initially, the In re Lampart court noted that under Michigan law, an order of restitution may be enforced in the same manner as a judgment in a civil action or a lien. Id. at 196. The court then applied the holding in Keffeler to the facts of this case:

> As the Supreme Court [in Keffeler] ruled, "other legal process" (1) requires the use of some judicial or quasi-judicial mechanism, (2) by which control over property passes from one person to another, (3) in order to discharge or secure discharge of an existing or anticipated liability.

> Unlike in Keffeler, we find that a judicial mechanism is being used here. Indisputably, resort is being made to the courts to secure payment. We further find that the judicial mechanism is being used to secure the discharge of an existing liability, i.e., restitution. The question, therefore, is whether it is being used to pass control over property from one person to another, in a manner that runs afoul of 42 U.S.C. § 407(a).

> We find that the reasoning of the trial court, if effectuated through its contempt powers so as to cause Alexandroni to satisfy her restitution obligations from her SSDI benefits, would be the use of a judicial mechanism to pass control over those benefits from one person to another. Thus, it would constitute "other legal process" that is prohibited under 42 U.S.C. § 407(a). The process by which the trial court would enforce the restitution order would be the employment of its civil-contempt powers. Civil contempt is defined as "[t]he failure to obey a court order that was issued for another party's benefit." Black's Law Dictionary (9th ed), p. 360. "A civil-contempt proceeding is coercive or remedial in nature." Id.

When used in this manner, the court's use of its civil-contempt powers to enforce a restitution order would act as a process much like the processes of execution, levy, attachment, and garnishment, because in that context, the process would involve a formal procedure by which the restitution victim, through the trial court, would gain control over [the mother's] SSDI benefits. See Keffeler, 537 U.S. at 383-385, 123 S. Ct. 1017. Indeed, Keffeler noted that the POMS defined "legal process" as it was used in 42 U.S.C. § 407(a) as "the means by which a court . . . compels compliance with its demand; generally, it is a court order." Id. at 385, 123 S. Ct. 1017 (citation and quotation marks omitted). In this case, the court's demand was the restitution order, and the court would compel compliance with that demand through its civil-contempt powers. Consequently, if the trial court were in fact to use its contempt powers in a manner as would compel Alexandroni to satisfy her restitution obligations using her SSDI benefits, we would find that the process employed falls within the definition of "other legal process" as the term is used in 42 U.S.C. § 407(a).

Id. at 199-200 (footnote omitted). The court added, "Although we find that a contempt order that would cause Alexandroni to satisfy her restitution obligations from her SSDI benefits would be the use of "other legal process" in contravention of 42 U.S.C. § 407(a), we decline to conclude that the mere specter of a contempt hearing necessarily constitutes such 'other legal process.'" Id. at 202 (emphasis added). It explained that while there was "some level of threat and coercion inherent in a prospective contempt proceeding itself, the specter of contempt also can serve the legitimate purpose of providing a mechanism by which an obligor's assets and income can be determined." Id. (citing Causley v. LaFreniere, 259 N.W.2d 445 (Mich. Ct. App. 1977); Moncada v. Moncada, 264 N.W.2d 104, 106 (Mich. Ct. App. 1978)). Significantly, the court recognized that pursuant to the current version of POMS, Alexandroni was "entitled at any contempt hearing to use 42 U.S.C. § 407(a) 'as a personal defense if ordered to pay . . . her payments to someone else, or if . . . her payments are ordered to be taken by legal process.'" Id. (quoting POMS GN 02410.001 (2014)).

The court ultimately held that 42 U.S.C. § 407(a) precludes the trial court from using a finding of contempt to reach Alexandroni's SSDI benefits:

If it were determined that Alexandroni's only asset, or source of income, is and remains from SSDI benefits, 42 U.S.C. § 407(a) prohibits the use of legal process—including by a finding of contempt—from reaching those benefits to satisfy the restitution order. See Philpott, 409 U.S. at 417, 93 S. Ct. 590. If, however, Alexandroni is found to have income aside from her SSDI benefits, or other assets that are derived from other sources, that

- 23 -

income or those assets could be used to satisfy the restitution award. The restitution order itself remains valid. Indeed, Alexandroni's receipt of SSDI benefits does not immunize her from the restitution order; rather, it merely prohibits the trial court from using legal process to compel satisfaction of the restitution order from those benefits. Because it is possible that Alexandroni may have assets or may receive income from other sources in the future, we affirm the trial court's refusal to cancel or modify Alexandroni's restitution obligation.

The trial court's contempt powers similarly remain a valid tool in enforcing the restitution order, and our decision today should not be read otherwise. Again, a contempt hearing can be an appropriate vehicle for determining income and assets from which the restitution order may properly be enforced. See Causley, 78 Mich. App. at 251, 259 N.W.2d 445; Moncada, 81 Mich. App. at 27–28, 264 N.W.2d 104. However, the trial court may not compel Alexandroni to satisfy her restitution obligation out of her SSDI benefits, by a contempt finding or other legal process, because Alexandroni is entitled to the protections of 42 U.S.C. § 407(a).

Id. at 203. The In re Lampart court, noting that the trial court had not yet held Alexandroni in contempt, "decline[d] to determine whether circumstances exist that might warrant a contempt order at this time." Id. at 201. However, it held that on remand, the trial court should periodically "ascertain Alexandroni's assets and sources of income, perhaps through a contempt hearing, and . . . enter further orders as appropriate, while avoiding any directive, either explicit or otherwise, that will in fact cause Alexandroni to have to invade her SSDI benefits (or the proceeds thereof) to satisfy her continuing restitution obligation." Id.

Here, a condition of the Defendant's probation is that he must pay $99,017.78 in restitution to the victim and must make monthly payments of $50, of which $45 would be applied to restitution. If the Defendant fails to comply with this restitution order, he could have his probation revoked and be forced to serve his sentence in confinement. The Defendant contends that the restitution order itself violates 42 U.S.C. § 407(a) because it is a "judicial mechanism" that compels him, through the threat of probation revocation and imprisonment, to use his Social Security benefits to satisfy his restitution violation. While the Defendant admits that the restitution order in his case does not attach his Social Security benefits with the same immediacy of a garnishment or levy, he contends that this order poses an even greater threat because if he misses even one monthly payment, the trial court can revoke his probation and order him to serve his entire sentence in confinement, which is far worse than having his paychecks garnished or his bank accounts seized. The Defendant asserts that there is no difference between the imposition of the restitution

- 24 -

obligation and the enforcement/collection of that obligation because the practical effect of the trial court's restitution order is that he must use his Social Security benefits to pay the restitution or face imprisonment, which he claims is precluded by Code section 407(a). The Defendant also insists that if this court does not resolve this issue now, defendants will be forced to appeal probation revocations on this issue after they are serving their sentences in jail.

We conclude that the restitution order and the accompanying order of probation in this case do not qualify as "other legal process" under 42 U.S.C. § 407(a). As In re Lampart, 856 N.W.2d at 203, makes clear, Section 407(a) does not prevent a trial court from considering Social Security benefits in determining whether to impose a restitution obligation but does preclude a trial court from using legal process to reach a person's Social Security benefits in order to satisfy a restitution obligation. In other words, while Section 407(a) does not immunize recipients of Social Security benefits from the imposition of a restitution obligation, it does provide protection against a trial court targeting Social Security benefits to enforce or collect a restitution obligation. See id.; In re J.G., 434 P.3d at 1118. Accordingly, we conclude that a trial court may consider a defendant's Social Security benefits when making an ability to pay determination because consideration of these benefits helps provide a clear picture of a defendant's complete financial status.

In this particular case, the restitution order merely imposed the Defendant's restitution obligation but did not target the Defendant's Social Security benefits to enforce or collect this restitution obligation, which would run afoul of Section 407(a). While the Defendant asks for relief from both the imposition of the restitution obligation and the mechanism used to enforce or collect this obligation, relief from the imposition of the restitution obligation is not contemplated by Keffeler, which held that the term "other legal process" be interpreted "far more restrictively." 537 U.S. at 384. The restitution order in this case, which imposes the restitution obligation along with the "specter" of enforcement through revocation, does not operate like the procedures of execution, levy, attachment, and garnishment in that it does not pass "control over property . . . from one person to another" in order to compel satisfaction of the restitution obligation. See id. at 385; Reed, 923 F.3d at 417; In re J.G., 434 P.3d at 1118. Accordingly, we conclude that the restitution order in this case does not constitute the type of "other legal process" precluded by 42 U.S.C. § 407(a). See Keffeler, 537 U.S. at 385; see also In re Lampart, 856 N.W.2d at 199-202; Reed, 923 F.3d at 417; J.G., 434 P.3d at 1118. However, if the Defendant's only source of income continues to be his Social Security benefits, the revocation of his probation, much like a finding of contempt, would place the Defendant in the position of either paying the restitution from these Social Security benefits or serving his sentence in confinement. Cf. Black's Law Dictionary (11th ed. 2019) (defining "attachment" as "[t]he arrest of a person who either is in contempt of court or is to be held as security for the payment of a judgment"). In such a scenario, the probation revocation, like a finding of

- 25 -

contempt, compels satisfaction of the restitution obligation from the Defendant's Social Security benefits and therefore qualifies as "other legal process" under 42 U.S.C. § 407(a). See In re Lampart, 856 N.W.2d at 200. At a probation revocation hearing, the Defendant would be entitled to use Section 407(a) as a "personal defense" to having his probation revoked, and incarceration ordered, for his non-payment of restitution. See id. at 202. Because the Defendant "may have assets or may receive income from other sources in the future," periodic probation revocation hearings may be utilized to determine the Defendant's income and assets, from which the restitution order may be satisfied. Nevertheless, the trial court may not compel the Defendant to satisfy his restitution obligation out of his Social Security benefits by revoking his probation and imprisoning him because the Defendant "is entitled to the protections of 42 U.S.C. § 47(a)." Id. at 203. Lastly, as to the Defendant's contention that he lacks the ability to make restitution payments even if his Social Security benefits are subject to court-ordered collection, we have already concluded that a remand for a new restitution hearing is appropriate in this case.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we reverse the judgment of the trial court as to restitution and remand this case for entry of a corrected judgment of conviction and probation order and for a new restitution hearing consistent with this opinion.

_____
CAMILLE R. MCMULLEN, JUDGE